**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **SERVICE EMPLOYEES INTERNATIONAL:** | | |
| **UNION, LOCAL 1,** *et al.*, | : | **Case No. 2:12-CV-562** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **JON HUSTED,** *et al.*, | : | |
| | : | **Magistrate Terence P. Kemp** |
| | : | |
| **Defendants.** | : | |
| | : | |
| | | |
| **THE NORTHEAST OHIO COALITION** | : | |
| **FOR THE HOMELESS,** *et al.*, | : | **Case No. 2:06-CV-896** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **JON HUSTED, in his official capacity as** | : | |
| **Secretary of the State of Ohio,** | : | **Magistrate Terence P. Kemp** |
| | : | |
| **Defendant,** | : | |
| | : | |
| **and** | : | |
| | : | |
| **STATE OF OHIO** | : | |
| | : | |
| **Intervenor-Defendant.** | : | |

**<u>PLENARY OPINION AND ORDER</u>**

# TABLE OF CONTENTS

Page #

I.    Introduction ............................................................................................    1

II.   Background ..............................................................................................    2

      A. Ohio's Precinct System and Provisional Voting Regime...............    3

      B. Legal Duties of Election Officials and "Poll-Worker Error" .......    7

III.  Motion to Intervene ...............................................................................    10

      A. Procedural History............................................................................    10

      B. Law and Analysis ...............................................................................    10

IV.   Motion for Preliminary Injunction .......................................................    12

      A. Summary...............................................................................................    12

      B. Legal Background ...............................................................................    13

          1. Ohio's Precinct-Only Eligibility Requirement Complies with HAVA....    13

          2. The *Hunter* Litigation ................................................................    14

      C. Preliminary Injunction Standard of Review ....................................    19

      D. Law and Analysis ...............................................................................    21

          1. Likelihood of Success on the Merits .............................................    21

              a. *Equal Protection* .................................................................    22

                  i. First Equal Protection Claim (Wrong-Precinct

                  Ballot Prohibition) ............................................................    24

                      (a) *Identifying the burden imposed by the Ohio law*......................    25

                      (b) *Whether the restriction if justified by sufficient state interests* ..    34

                      (c) *The restriction fails review for invidiousness*............................    40

                  ii. Second Equal Protection Claim (Ballot

Envelope Deficiencies) ........................................................................ 42

iii.  Third Equal Protection Claim (Disparate Impact

of Poll-Worker Error by County) ........................................................ 46

iv.  Fourth Equal Protection Claim (Unequal Treatment of

Provisional Voters) ............................................................................ 48

**b.  *Substantive Due Process*** ........................................................................ **50**

**2.  Irreparability of Harm** ........................................................................ **51**

**3.  Balancing of Harms** ............................................................................ **52**

**4.  Public Interest** .................................................................................... **53**

**E.  Appropriate Injunctive Relief** ........................................................................ **56**

**V.  Motion to Modify the Consent Decree** .................................................................. **57**

iii

## I.  INTRODUCTION

These two related cases[1] are before the Court for determination of the following matters: first, the Motion to Intervene filed by the Proposed Intervenors Roberta Van Atta, Emilie Illson, Thomas Kelly, and Charles Pennell in *Service Employees International Union*, *Local 1 et al. v. Husted* ("*SEIU*") ("Motion to Intervene," Dkt. 65); second, the Motion for Preliminary Injunction filed by the Plaintiffs in *SEIU* ("Motion for Preliminary Injunction," Dkt. 4); and third, the Motion to Modify the Consent Decree filed by the Plaintiffs in *Northeast Ohio Coalition for the Homeless et al. v. Husted* ("*NEOCH*") ("Motion to Modify," Dkt. 288).

The *SEIU* Plaintiffs' Motion for Preliminary Injunction seeks to enjoin specific provisions of Ohio's election code that disqualify provisional ballots cast in the wrong precinct or cast with deficiencies in the ballot envelope form, when the ballot's deficiency is the result of an error by the poll worker.  Similarly, the *NEOCH* Motion to Modify requests that the Court expands the terms of the *NEOCH* Consent Decree ("Decree," Dkt. 210) to state that the county boards of elections ("Boards") may not reject a provisional ballot cast by a voter who uses only the last four digits of his or her social security number as identification because of poll-worker error.  Because the requested relief in the Motion to Modify is encompassed within the Plaintiffs' proposed injunction in the Motion for Preliminary Injunction,[2] and because the basis for relief in the Motion to Modify depends on the determination of the constitutional violations at issue in the *SEIU* case, the Court will address the merits of the *SEIU* motions first.

---

[1] On June 26, 2012, the Court determined these two actions challenging the constitutionality of Ohio's voter identification and provisional ballot laws to be related cases pursuant to S.D. Ohio Local Rules § 3.1(b)(2).  *See* Order Relating Cases, 06-cv-896, Dkt. 302; 12-cv-562, Dkt. 16.

[2] In Plaintiffs' words, SEIU's proposed preliminary injunction requests "the same injunctive relief as proposed by [the *NEOCH* Motion to Modify], but with respect to all Ohio provisional voters."  Motion to Modify, at 5.

## II. BACKGROUND

These cases together represent the turbulent saga of Ohio's provisional voting regime. On January 31, 2006, Ohio's comprehensive election reform bill, House Bill 3, was passed by the Ohio General Assembly and signed into law. Shortly after the November 2006 general election, the *NEOCH* Plaintiffs brought their initial challenge to Ohio's amended voter identification requirements. *See NEOCH v. Brunner*, No. C2-06-CV-896 (S.D. Ohio). The *NEOCH* lawsuit alleges, *inter alia*, that Ohio's voter identification laws violate the Equal Protection and Due Process Clauses of the Fourteenth Amendment. The parties in *NEOCH* initially resolved the lawsuit prior to any final adjudication on the merits of Plaintiffs' constitutional claims by entering into the Decree in April 2010. The Decree, "among other provisions, mandated that the Board 'may not reject a provisional ballot cast by a voter, who uses only the last four digits of his or her social security number as identification' if certain deficiencies in the ballot, including being cast 'in the wrong precinct, but in the correct polling place,' were the result of poll-worker error." *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 223 (6th Cir. 2011) ("*Hunter I*") (quoting Decree, at ¶ 5).

Earlier this year, the Relators and Defendants sought to vacate the Decree's terms. The Plaintiffs objected, however, and the Court upheld the validity of the Decree in its most recent opinion and order. *See NEOCH*, No. 06-CV-896, 2012 U.S. Dist. LEXIS 94086 (S.D. Ohio July 9, 2012). During the pendency of the Defendants' request to vacate the Decree, Plaintiffs filed their Motion to Modify, and different (along with some of the same) organizations in the *SEIU* case filed a new challenge to Ohio's provisional ballot-counting rules. The *SEIU* Plaintiffs seek a statewide injunction requiring that registered voters' provisional ballots which are cast in the wrong precinct (so-called "wrong-precinct ballots"), or cast with technically deficient ballot

2

envelopes, still be counted unless the poll worker who processed the deficient ballot affirms that the ballot deficiency is not the result of poll-worker error.

### A. Ohio's Precinct System and Provisional Voting Regime

The following explanation of developments in the legal landscape of Ohio's voter eligibility and provisional ballot counting standards is relevant to both lawsuits.  Following the 2000 general election, Congress turned its attention to the "significant problem" of voters being turned away from polls because election workers were unable to confirm the voters' eligibility on the spot.  *See Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 569 (6th Cir. 2004).  In 2002, Congress passed the Help America Vote Act, 42 U.S.C. § 15301 *et seq.* ("HAVA"), which "creat[ed] a system for provisional balloting . . . under which a ballot would be submitted on election day but counted if and only if the person was later determined to have been entitled to vote."  *Sandusky*, 387 F.3d at 569 ("In essence, HAVA's provisional voting section is designed to recognize, and compensate for, the improbability of 'perfect knowledge' on the part of local election officials.").  Under HAVA, any person at the polling place "who claims eligibility to vote, but whose eligibility to vote at that time and place cannot be verified" by the election worker, "shall be permitted to cast a provisional ballot."  *See Sandusky*, at 569–70 (quoting 42 U.S.C. § 15482(a)).

Before 2004, Ohio did not require an individual to present identification either when registering to vote or when voting.  Federal law under HAVA contained only a limited voter identification requirement, applicable only to first-time voters who registered by mail.  *See* 42 U.S.C. § 15483.  The 2006 amendments to Ohio's election code, however, "require that voters provide any of several specific types of identification in order to cast a regular ballot in state and federal elections held in Ohio."  *Northeast Ohio Coalition for Homeless and Serv. Emp. Intern.*

3

*Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1002 (6th Cir. 2006); *see also* Ohio Rev. Code §

3505.18. Ohio's voter identification requirements, which have been referred to as "exceptionally

convoluted,"[3] now provide thirteen different statutory reasons why an individual will be required

to cast a provisional ballot on election day. *See* Ohio Rev. Code § 3505.181(A)(1)–(13).[4]

Plaintiffs blame Ohio's complicated voter identification and provisional ballot laws for the

relatively high rate of Ohio voters forced to cast provisional ballots rather than normal ballots in

recent elections.[5]

      To cast a provisional ballot, the voter must first execute an affirmation stating that he or

she is registered to vote in the jurisdiction and is eligible to vote in the election. *Id.* §§

3505.181(B)(2); 3505.182. Rather than being "placed into the eScan on election day like a

regular voter's ballot," the provisional ballot is then "sealed in a special 'Provisional Ballot

Affirmation Envelope.'" *Hunter v. Hamilton Cnty. Bd. of Elections*, 2012 WL 404786, at *9

(S.D. Ohio Feb. 8, 2012) ("*Hunter II*"). The Board later determines whether a provisional ballot

is valid and required to be counted. If the Board is able to determine that the individual is

eligible "to cast a ballot in the precinct and for the election in which the individual cast the

provisional ballot," the provisional ballot is counted. Ohio Rev. Code § 3505.183(B)(3)(b).

---

[3] *See* Daniel P. Tokaji, *Leave it to the Lower Courts: On Judicial Intervention in Election Administration*, 68 Ohio St. L. J. 1065, 1079 (2007).

[4] For example, individuals who do not have an acceptable form of identification, whose names are not on the official list of eligible voters for the polling place, who requested an absentee ballot, or whose signature was deemed by the precinct official not to match the name on the registration forms may be asked to cast a provisional ballot. *See* Ohio Rev. Code § 3505.181(A)(1)–(13).

[5] Ohio's rate of provisional ballots cast as a percentage of total ballots cast was around three times the national average in both the 2008 and 2010 elections. *See* Declaration of Professor David C. Kimball, Exh. B, David C. Kimball, "Provisional Voting in Ohio and the Nation," June 2012 (hereinafter, "Kimball Report"), Dkt. 9-2, Tables 1–2. In the 2008 general election, for example, more than 200,000 Ohio voters were required to cast provisional ballots—more than any other state besides California. *Id.*, Table 3, p. 6.

Conversely, if the Board determines that "[t]he individual named on the affirmation is not eligible to cast a ballot in the precinct or for the election in which the individual cast the provisional ballot," then "the ballot envelope shall not be opened and the ballot shall not be counted." *Id.* § 3505.183(B)(4)(a)(ii).[6]

Ohio divides its voting jurisdictions into precincts. Courts have recognized that "[t]he advantages of the precinct system are significant and numerous," *Sandusky*, 387 F.3d at 569,[7] although certain "troubling" aspects of Ohio's precinct system have been identified as cause for great concern. *See Hunter I*, 635 F.3d at 243–44. Primarily implicated by Plaintiffs' challenges here, as in *Hunter*, is Ohio's strict disqualification of any ballot cast in the wrong precinct, regardless of the reason. *See* Ohio Rev. Code § 3505.183(B)(4)(a)(ii); *State ex rel. Painter v. Brunner*, 941 N.E.2d 782, 794 (Ohio 2011) (holding that Ohio's election statutes "do not

---

[6] Subsection (4)(a) provides that, "[i]f, in examining a provisional ballot affirmation and additional information under divisions (B)(1) and (2) of this section and comparing the information required under division (B)(1) of this section with the elector's information in the statewide voter registration database, the board determines that any of the following applies, the provisional ballot envelope *shall not be opened, and the ballot shall not be counted*:

    (i) The individual named on the affirmation is not qualified or is not properly registered to vote.

    (ii) The individual named on the affirmation is not eligible to cast a ballot in the precinct or for the election in which the individual cast the provisional ballot."

Ohio Rev. Code § 3505.183(B)(4)(a)(ii) (emphasis added).

[7] As the Sixth Circuit states:

    [I]t [the precinct system] caps the number of voters attempting to vote in the same place on election day; it allows each precinct ballot to list all of the votes a citizen may cast for all pertinent federal, state, and local elections, referenda, initiatives, and levies; it allows each precinct ballot to list only those votes a citizen may cast, making ballots less confusing; it makes it easier for election officials to monitor votes and prevent election fraud; and it generally puts polling places in closer proximity to voter residences.

*Sandusky*, 387 F.3d at 569.

authorize an exception based on poll-worker error to the requirement that ballots be cast in the proper precinct in order to be counted").[8]

Under the Ohio Supreme Court's holding in *State ex rel. Painter v. Brunner*, provisional ballots cast in the wrong precinct must be summarily disqualified, even if the voter was not at fault, and even if the Board determines that the voter is lawfully registered to vote.[9]  *See* 941 N.E.2d at 794–95.  The current application of Ohio law "penalizes the voter when a poll worker directs the voter to the wrong precinct."  *Hunter I*, 635 F.3d at 244 (adding that "the penalty, disenfranchisement, is a harsh one indeed").

The problems created by Ohio's rejection of all provisional ballots cast in the wrong precinct are exacerbated by the increasingly widespread prevalence of "multi-precinct" polling locations throughout the State.[10]  These are polling places, more often utilized in large urban counties, that, "[f]or financial and other administrative reasons . . . serve as the polling location for several nearby precincts."  *Id.* at 223.  Poll workers serving multi-precinct polling places are tasked with determining the correct provisional ballot to give each provisional voter based on the

---

[8] By now it is established and undisputed that, aside from those provisional ballots protected by the Decree, Ohio law under *Painter* mandates the strict disqualification of any ballot cast in the wrong precinct, with no exceptions for ballots miscast due to poll-worker error.  *See NEOCH*, 2102 U.S. Dist. LEXIS 94086, at *34–45.

[9] The only exception to rejecting wrong-precinct ballots recognized under *Painter* is for provisional ballots covered by the *NEOCH* Decree.  *See Painter*, 941 N.E.2d at 795 (noting that the Board's determination of "whether poll-worker error caused provisional ballots in multiple-precinct locations to be cast in the wrong precinct, were accordingly limited to provisional ballots cast by voters who used only the last four digits of their Social Security numbers as identification").

[10] Data returned to Plaintiffs from the responsive Boards suggests that, in the recent 2012 primary election, for example, the large majority of voting precincts were located in multi-precincts polling locations. *See* Declaration of Natalya DeRobertis-Theye, Dkt. 8, ¶ 5.  For example, Cuyahoga County now has 998 of its 1063 total precincts, or 94 percent, in multi-precinct polling locations, with an average of 2.73 precincts per multi-precinct polling location. *Id.* Exh. A.  Examples of other counties include: Butler (95 percent of precincts in multi-precinct locations, average of 3.31); Greene (100 percent, average 3.68 precincts per multi-precinct location); Franklin (68 percent, average 2.40 precincts per multi-precinct location); Lorain (90 percent, average 2.95 precincts per multi-precinct location); Montgomery (88 percent, average 2.36 precincts per multi-precinct location); Stark (71 percent, average 2.55 precincts per multi-precinct location).  *Id.*

precinct in which the voter resides. The additional confusion created by multi-precinct polling locations increases the instances of so-called "wrong-precinct" provisional ballots given out to voters by poll workers, only to be disqualified upon further review by the county Board.[11] Statewide, in these multi-precinct polling locations, registered voters who arrive at their correct polling location have received provisional ballots for the wrong precinct from the poll worker.[12] *See id.* at 244 n.24 (noting, "[a]s a result, fewer provisional ballots are likely to be counted in multiple-precinct polling places than in those that serve only a single precinct").

### B. Legal Duties of Election Officials and "Poll-Worker Error"

Before an election, the Boards train "election officials" (i.e., poll workers) and instruct them using the materials and directives provided by the Secretary. Ohio Rev. Code § 3501.22. Poll workers have significant and specific legal responsibilities,[13] including determining whether an individual is eligible to vote in the precinct, Ohio Rev. Code. § 3505.181(C)(1). Poll workers must also direct an individual to his or her correct precinct if the individual attempts to vote in the wrong precinct.[14] *Id.* As the Court explained in *Hunter II*, "so long as a voter gives the poll

---

[11] *See, e.g., Hunter II*, where:

> the evidence showed that multi-precinct voting creates great pressures on poll workers, who are expected to learn a complicated provisional voting process and navigate an obfuscatory address book after a mere three-hour training course. Poll workers in these circumstances are more likely to make mistakes in processing provisional voters than Board staff working at the Board office, where a staff person need only enter a voter's address into a computer to discern which ballot to provide.

2012 WL 404786, at *40.

[12] *See* Kimball Report, Table 15, discussed, *infra*.

[13] For example, "[p]oll workers are responsible for receiving ballots and supplies, opening and closing the polls, and overseeing the casting of ballots during the time the polls are open." *Hunter II*, 2012 WL 404786, at *7 (citing Ohio Rev. Code § 3501.22).

[14] Specifically, Ohio law requires that:

worker his or her correct address and the poll worker complies with state law, a voter cannot cast a provisional ballot in the wrong precinct without knowing that he is casting it in the wrong precinct and that, consequently, the ballot will not be counted." 2012 WL 404786, at *9.

As summarized by the Sixth Circuit, "Ohio has created a precinct-based voting system that delegates to poll workers the duty to ensure that voters, provisional and otherwise, are given the correct ballot and vote in the correct precinct." *Hunter I*, 635 F.3d at 243. The State of Ohio has defined "poll-worker error" as "'when a poll worker acts contrary to or fails to comply with federal or Ohio law or directive issued by the Secretary of State.'" *See Painter*, 941 N.E.2d at 789 (quoting Directive 2010-79). As a matter of law, if a person casts a provisional ballot in the wrong precinct, it is *always* going to be due to poll-worker error unless the poll worker has instructed the individual where the correct polling location is and that individual "refuses to travel to the polling place for the correct [precinct] or to the office of the board of elections to cast a ballot." Ohio Rev. Code §§ 3505.181(C)(2), 181(E)(1). Such an act would be an irrational and futile exercise by the voter, because, as required by Ohio Rev. Code § 3505.181(C)(1), the poll worker must first inform him that if he insists on voting in the wrong precinct, his ballot will not be counted.

Besides directing voters to the correct precinct, poll workers also have specific duties for ensuring that provisional ballots are cast properly. On election day, if an individual is required to

---

. . . if, upon review of the precinct voting location guide using the residential street address provided by the individual, an election official at the polling place at which the individual desires to vote determines that the individual is not eligible to vote in that jurisdiction, the election official shall direct the individual to the polling place for the jurisdiction in which the individual appears to be eligible to vote, explain that the individual may cast a provisional ballot at the current location but the ballot will not be counted if it is cast in the wrong precinct, and provide the telephone number of the board of elections in case the individual has additional questions.

Ohio Rev. Code § 3505.181(C)(1).

cast a provisional ballot, the poll worker must first affirm that the individual has executed the provisional ballot affirmation statement before transmitting the ballot, along with "the voter information contained in the written affirmation executed by the individual," for evaluation of its eligibility. Ohio Rev. Code §§ 3505.181(B)(2)–(3), 3505.182. If the individual declines to execute such an affirmation, the poll worker must include "the individual's name [or other information] . . . in a written affirmation in order for the provisional ballot to be eligible to be counted." *State ex rel. Skaggs v. Brunner*, 900 N.E.2d 982, 990 ("*Skaggs II*") (Ohio 2008).[15]

If the poll worker fails to ensure the provisional ballot envelope is transmitted with the required voter name, signature, or executed affirmation, the ballot may be disqualified. The Ohio Supreme Court has held that Boards must reject provisional ballots if the voter's affirmation and/or other identifying information on the envelope form is incomplete, even where it is otherwise determinable by the Board who the voter is and that the voter is lawfully registered. *Id.* at 992–93. For example, under Ohio law as interpreted by *Skaggs II* and *Painter*, Boards reject provisional ballots of eligible, registered voters if there is a printed name on the

---

[15] As stated in *Skaggs II* by the Ohio Supreme Court:

> [P]ursuant to R.C. 3505.182, if the individual declines to execute the affirmation, an appropriate local election official shall comply with R.C. 3505.181(B)(6), which states that the appropriate local election official shall record the individual's name and include that information with the transmission of the ballot under § 3505.181(B)(3). Finally, an election official at the polling place shall transmit the individual's name if the individual declines to execute such an affirmation to an appropriate local election official for verification, and the official receiving the individual's name must then verify whether the individual is eligible to vote before his or her vote will be counted. § 3505.181(B)(3) and (4).

*Id.*

affirmation form but no signature; a signature on the affirmation but no printed name; or where the printed name or signature is in the wrong place on the envelope.[16]  *See id.* at 988–93.

The Parties' dispute in these cases is over whether the United States Constitution allows Boards to reject the provisional ballots of lawfully-registered voters that are cast in the wrong precinct, or are cast with deficiencies in the ballots envelope or voter affirmation, due to poll-worker error.

### III.  MOTION TO INTERVENE

### A.  Procedural History

On July 27, 2012, the business day preceding the scheduled hearing on Plaintiffs' Motion for Preliminary Injunction, a "bipartisan" group of qualified voters for the upcoming November 2012 election (the "Proposed Intervenors"), filed a Motion to Intervene in the action, under Fed. R. Civ. P. 24(b)'s standard for permissive intervention.  Counsel for the Proposed Intervenors appeared at the plenary hearing, and the Court heard arguments on the Motion to Intervene on the record.  For the reasons provided by the Court at the July 30, 2012 plenary hearing, and those described below, the Proposed Intervenors' Motion is **DENIED**.

### B.  Law and Analysis

Under Rule 24(b), "[o]n timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact."  Fed. R. Civ. P. 24(b)(1)(B).  Whether an applicant will be permitted to intervene under Rule 24(b) lies within the sound discretion of the trial court.  *Coal. to Defend Affirmative Action v. Granholm*,

---

[16] The Secretary notes that the ballot envelope form has been simplified in new directives issued this year. Moreover, On January 4, 2012, Secretary Husted issued Directive 2012-01, which expressly instructs boards of elections that provisional ballots are *not* to be rejected if the poll worker fails to fill out his or her portion of the provisional ballot envelope.

501 F.3d 775, 784 (6th Cir. 2007) ("The denial of permissive intervention should be reversed only for clear abuse of discretion[.]") (internal quotation marks and citations omitted). The Sixth Circuit has held that "[t]he timeliness of a motion to intervene is a threshold issue." *Blount–Hill v. Zelman*, 636 F.3d 278, 284 (6th Cir. 2011) (affirming that where the "proposed Interveners' application was untimely—and would thus cause undue delay and prejudice to the existing parties as discussed above—the district court did not abuse its discretion in denying their application for permissive intervention").

First, the Proposed Intervenors' motion to intervene is untimely, coming after briefing had concluded on the Motion for Preliminary Injunction, and just one business day before the hearing on that motion. Allowing the applicants' intervention will prejudice the existing parties and "will inhibit, not promote, a prompt resolution," which is of particular concern in this election case. *See Granholm*, 501 F.3d at 784 (internal quotation marks omitted). There is no excuse for the Proposed Intervenors' untimeliness, as their concerns regarding voter dilution have been ripe at least since the Complaint was filed in *SEIU*, and potentially since the time the Decree was entered into and the Boards began counting wrong-precinct ballots.

Second, the Court is assured that the interests of the Proposed Intervenors are adequately represented in this case by the Secretary, who has an official duty to represent the interests of all voters statewide. The Proposed Intervenors' concern is the dilution of their voting rights resulting from counting out-of-precinct votes.[17] The Secretary's arguments in opposition to the Plaintiffs' Motion for Preliminary Injunction address this precise concern of "split-precinct" voter dilution, discussed, *infra* Sections IV.D.1(a), IV.D.3. The Proposed Intervenors' concerns are not "unique" to them. Counsel for the Secretary represented to the Court at the plenary

---

[17] *See* Motion to Intervene, at 3.

11

hearing that the Secretary is defending the interests of all split-precinct voters, including the Proposed Intervenors.[18] The Court finds that there is no substantive difference between the position taken by the Proposed Intervenors and that taken by the Secretary on this issue.

Given the untimeliness of their request, and the Secretary's adequate representation of the concerns raised by the Proposed Intervenors, the Court finds the movants' interest in participating in the litigation is outweighed by the prejudice to the existing parties and the delay such participation would necessitate. The Motion to Intervene is **DENIED**.

## IV. MOTION FOR PRELIMINARY INJUNCTION

### A. Summary

On June 22, 2012, the *SEIU* Plaintiffs filed their Complaint and Motion for Preliminary Injunction.[19] Plaintiffs contend that an injunction is necessary to prevent the irreparable and unconstitutional disqualification of thousands of lawfully-registered voters' ballots in the upcoming November 2012 general election. Plaintiffs move this Court to require the Secretary to issue a Directive requiring that the Boards "may *not* reject any provisional ballots cast by lawfully-registered voters in the November 2012 general election" which are: (1) cast in the wrong precinct, unless the poll worker first affirms under penalty of perjury that he or she directed the voter to the correct precinct and informed the voter that his or her vote would not be counted if cast in the wrong precinct, but the voter refused to vote in the correct precinct; or (2)

---

[18] Transcript of Oral Proceedings, July 30, 2012, 12-cv-562, 18:10–21.

[19] Plaintiffs have since amended their Complaint twice, and no longer name any Defendant other than the Secretary, in his capacity as chief elections officer for the State of Ohio. *See* Ohio Rev. Code § 3501.05(A).

cast with a deficient ballot envelope form, but where "the County Board of Elections has otherwise been able to determine that the voter is a registered voter."[20]

The Parties have submitted their memoranda and documentary evidence in support of their positions, and oral argument was heard on the motion at the July 30, 2012 plenary hearing before this Court. The matter is therefore ripe for adjudication. The Court finds that the relevant factors weigh in favor of granting preliminary injunctive relief.

### B. Legal Background

#### 1. Ohio's Precinct-Only Eligibility Requirement Complies with HAVA

In *Sandusky*, the Sixth Circuit held that HAVA's passage did not disturb Ohio's requirement that individuals must cast their ballots in the correct precinct to have their votes counted. *See Sandusky*, 387 F.3d at 577-78 (holding that "being eligible under State law to vote means eligible to vote in this specific election in this specific polling place"). The *Sandusky* Court addressed whether HAVA "require[d] that all states count votes . . . cast by provisional ballot as legal votes, even if cast in a precinct in which the voter does not reside, so long as they are cast within a 'jurisdiction'" in which the voter resides. *Id.* at 568. The Court concluded that "in Ohio, HAVA requires that a provisional ballot be issued only to voters affirming that they are eligible to vote and are registered to vote in the precinct in which they seek to cast a ballot." *Id.* at 576 (adding, "[n]o one should be 'turned away' from the polls, but the ultimate legality of the vote cast provisionally is generally a matter of state law").

The relevance of *Sandusky* to the Plaintiffs' challenges to Ohio law, however, is limited. *Sandusky* was decided before Ohio instituted its amended Voter ID requirements in 2006. Although *Sandusky* establishes that Ohio's precinct eligibility requirement complies with the

---

[20] *See* Dkt. 56-1, Plaintiffs' Second Modified Proposed Order Granting Motion for Preliminary Injunction, at 2.

federal provisional-ballot regime created under HAVA, that case did not address the *constitutionality* of the precinct eligibility requirement as applied to provisional ballots cast in the wrong precinct as a result of poll-worker error.[21]  While "[t]here is no reason to think that HAVA, which explicitly defers determination of whether ballots are to be counted to the States, should be interpreted as imposing upon the States a federal requirement that out-of-precinct ballots be counted," *id.* at 578, there is every reason to believe that the Constitution imposes such a requirement—at least when the provisional ballot is cast out-of-precinct because of an intervening poll-worker error.

## 2.  The *Hunter* Litigation

The *Hunter* Litigation raised a number of the same constitutional issues raised by the Plaintiffs here.  That case involved the provisional-ballot recount procedures of the Hamilton County Board following the 2010 Hamilton County election for juvenile court judge.  Like the Plaintiffs in this case, Tracie Hunter, plaintiff and candidate for the juvenile judge seat, sought a temporary restraining order and preliminary injunction in this Court, alleging federal due process and equal protection violations after the defendant Hamilton County Board's initial ballot count placed her 23 votes behind opponent John Williams.  This Court granted Hunter's motion for preliminary injunction in part, and ordered the Board immediately to begin an investigation into whether poll-worker error contributed to the rejection of certain provisional ballots that were cast in the wrong precinct.  *See Hunter v. Hamilton Cnty. Bd. of Elections*, No. 10-CV-820, 2010 WL 4878957 (S. D. Ohio, Nov. 22, 2010) (Dlott, C.J.).

---

[21] Defendant Secretary admits that the *Sandusky* case, as well as "the other cited decisions [in his Opposition,] do not squarely address the precise issue raised by the Plaintiffs in this case."  Secretary Opp. at 6.

Pursuant to the Court's orders, the Secretary of State "issued several directives to facilitate the Board's investigation," and "[t]hose directives soon became the subject of [Williams's] action for a writ of mandamus," filed in the Ohio Supreme Court in *Painter*. *Hunter II*, 2012 WL 404786, at *1. The *Painter* Court "concluded that [the Secretary's] postelection instructions to the Board of Elections were not justified by Ohio law or this Court's orders [in the Decree]," and made the following specific holdings of state law relevant to this case:

> (1) "there is no exception to the statutory requirement that provisional ballots be cast in the voter's correct precinct,"; (2) "election officials err in presuming poll-worker error because in the absence of evidence to the contrary, [poll workers] . . . will be presumed to have properly performed their duties in a regular and lawful manner and not to have acted illegally or unlawfully"; and (3) statistical analysis is not proper evidence of poll-worker error.

*Hunter I*, 635 F.3d at 239 (internal citations omitted) (stating, however, that "these state-law issues do not resolve the federal constitutional question in this case").

Following *Painter*, Secretary Husted rescinded and replaced Brunner's directives, and certified the results of the Hunter-Williams electoral race as of the date preceding the Board's investigations into poll-worker error. *See Hunter II*, 2012 WL 404786, at *1. Hunter sought an emergency order in this Court to enforce the preliminary injunction, which the Court granted and ordered the Board to count certain provisional ballots, "namely, those which the Board's court-ordered investigation had revealed were cast in the wrong precinct due to poll-worker error." *Id.* at *2. The Board appealed the district court's order to the Sixth Circuit. A unanimous three-judge panel affirmed this Court's preliminary injunction, and affirmed, in part, the court's latter order granting the emergency motion to enforce the injunction. *See Hunter I*, 635 F.3d at 247,

*rehearing, en banc, denied*, 2011 U.S. App. LEXIS 26342 (6th Cir., Mar. 29, 2011), *application denied*, 131 S. Ct. 2149, 2011 U.S. LEXIS 3188 (U.S., April 20, 2011).

The Sixth Circuit first established its jurisdiction over the federal constitutional challenges to the actions taken by Ohio officials under the color of state law, and rejected defendants' requests that it abstain from review. *See id.* at 232–34. The court then reviewed the district court's determinations on the likelihood of success of the plaintiffs' alleged Equal Protection and Due Process Clause claims under the Supreme Court's "balancing approach applied to constitutional challenges to election regulations." *Id.* at 238 (citing *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190 (2008)).

The Sixth Circuit began by noting that, "[c]onstitutional concerns regarding the review of provisional ballots by local boards of elections are especially great" because "the review of provisional ballots occurs after the initial count of regular ballots is known," and because of the "quasi adjudicatory-type action" required by the Board's determination of eligibility and counting of provisional ballots. *Id.* at 235 ("In contrast to more general administrative decisions, the cause for constitutional concern is much greater when the Board is exercising its discretion in areas relevant to the casting and counting of ballots, like evaluating evidence of poll-worker error.") (internal quotations omitted).

On plaintiffs' equal protection challenge to the Board's inconsistent treatment of different groups of provisional ballots in its investigation for evidence of poll-worker error, the Sixth Circuit "agree[d] with the district court's analysis," and "conclude[d] that there is a strong likelihood of success on this equal-protection claim which weighs heavily in favor of the district court's grant of a preliminary injunction." *Id.* at 236–43. Although the *Hunter* Court's fact-specific conclusions on the "as-applied" equal protection claims regarding the Hamilton Board's

treatment of the 849 provisional ballots are limited to its context, the Plaintiffs' equal protection claims in this case require the Court to apply the same legal framework and analysis as applied by the Sixth Circuit in *Hunter*.  *See*, *infra* Section IV.B.2.

The Plaintiffs' substantive due process claim in this case *is* identical to the one asserted in *Hunter*.  The *Hunter* plaintiffs "present[ed] the argument that failure to count provisional ballots cast in an incorrect precinct due to poll-worker error violates the Due Process Clause."  *Id.* at 243.  On this general challenge, the Sixth Circuit stated that "we have substantial constitutional concerns regarding the invalidation of votes cast in the wrong precinct due solely to poll-worker error" and that "[a]rguably, these two provisions [Ohio Rev. Code §§ 3505.181(C) and (B)(4)(a)(ii)] operate together in a manner that is fundamentally unfair to the voters of Ohio, in abrogation of the Fourteenth Amendment's guarantee of due process of law."  *Id.* (concluding, "[t]o disenfranchise citizens whose only error was relying on poll-worker instructions appears to us to be fundamentally unfair").  The Court remanded the due process claim to be decided by the district court in the first instance, as the parties had not fully briefed the issue.  *See id.* at 244.

On its review of the additional equitable factors influencing the district court's preliminary injunction, the Sixth Circuit recognized that "both the state and the voting public have interests at stake."  *Id.* ("States are primarily responsible for regulating federal, state, and local elections . . . and have a strong interest in their ability to enforce state election law requirements . . . . Members of the public, however, have a strong interest in exercising the fundamental political right to vote.") (internal citations omitted).  The equitable factors in that case "support[ed] the district court's grant of a preliminary injunction."  *Id.* at 245 (vacating only part of the district court's subsequent emergency order because it "in effect, modif[ied] the November 22 order—without prior notice to Defendants or an opportunity for a hearing").

17

The Sixth Circuit remanded "to the district court in the first instance, applying the uniformity requirement of *Bush v. Gore*, to direct the Board how to proceed" regarding the remaining disputed ballots.  *Id.* at 246.

The Sixth Circuit in *Hunter I* recognized that counting wrong-precinct ballots could have statewide equal protection implications, *see id.* at 242, but ruled that "to the extent that Ohio election procedures present equal-protection and due-process problems in local contests in other counties, they may be resolved in separate litigation."  *Id.* ("The inconsistent treatment of provisional ballots across Ohio counties and the precise degree of inequality from county to county tolerated by the Constitution is not at issue here.").  That "hypothetical statewide challenge" foreseen by the *Hunter I* Court has now arrived in the form of the *SEIU* Plaintiff's lawsuit.

In *Hunter II*, on remand to this Court, the Board moved to dismiss and for summary judgment, and the Court held a three-week bench trial.  In its final merits decision on the plaintiffs' equal protection claims, the Court ruled that "equal protection demanded that the Board consider right-location, wrong precinct [provisional] ballots on the same terms as ballots cast at the Board office."  *Hunter II*, 2012 WL 404786, at *40–41 (also finding, however, "there was insufficient evidence presented at the permanent injunction hearing for the Court to conclude that poll-worker error was the reason certain voters did not complete the affirmation statement on the provisional ballot envelope").

The Court was unable to make a final ruling on the plaintiffs' claim that the Board's failure to count the wrong-precinct ballots due to poll-worker error violated the Due Process Clause because the plaintiffs had not provided notice for such challenges to the Ohio Attorney General's office as required by Fed. R. Civ. P. 5.1(a).  Despite lacking "jurisdiction to order a

18

remedy," the Court concluded, based on the full record before it, that Ohio Rev. Code § 3505.181(C)(1)—delegating to poll workers the duty to direct voters to the correct precinct—and § (B)(4)(a)(ii)—providing that provisional ballots cast in the wrong precinct shall not be counted under any circumstance—violate the Due Process Clause of the Fourteenth Amendment, at least "where evidence of poll-worker error exist."  *See id.* at *43, 46.

Because the *Hunter* Court lacked jurisdiction to issue a final ruling on the constitutionality of Ohio's provisional ballot laws, *Painter*'s requirement that the Boards disqualify wrong-precinct provisional ballots cast due to poll-worker error, unless protected by the Decree, remains the law of the state.  The Plaintiffs in these cases bring their current challenges to enjoin this provision of Ohio law.

## C.  Preliminary Injunction Standard of Review

The Plaintiffs' request to enjoin the Secretary from enforcing certain provisions of Ohio law in the upcoming November 2012 election invokes the four-factor balancing test for determining whether an injunction is appropriate under Fed. R. Civ. P. 65.  The Court must weigh the following factors:

> (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction.

*Hunter I*, 635 F.3d at 233.

These four factors "guide the discretion of the district court[;]" however, "they do not establish a rigid and comprehensive test," *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 102 (6th Cir. 1982).  Whether the combination of the factors weighs in favor of issuing injunctive relief in a particular case is left to the discretion of the district court.  *See Leary v.*

*Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2007) (in reviewing an application to preliminarily enjoin operation of Arizona's voter identification procedures, the Supreme Court recognized courts' need to "weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases additional exigencies," and stated these complex determinations required "deference to the discretion of the District Court").

The Secretary argues that, to meet their burden for obtaining a preliminary injunction, Plaintiffs must "establish [their] case" by "clear and convincing evidence." (Secretary Opp., Dkt. 28, at 10) (relying on *Damon's Rests., Inc. v. Eileen K Inc.*, 461 F. Supp. 2d 607, 621 (S.D. Ohio Aug. 30, 2006)). While the Sixth Circuit has stated that "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion," *Leary*, 228 F.3d at 739, it is important that Defendants do not misunderstand the nature of a court's balancing exercise for weighing the merits of a preliminary injunction request. The Sixth Circuit has held that "a party is not required to prove his case in full at a preliminary injunction hearing and the findings of fact and conclusions of law made by a court granting the preliminary injunction are not binding at trial on the merits." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (citations omitted).

A plaintiff has "the burden of establishing a clear case of irreparable injury and of convincing the Court that the balance of injury favor[s] the granting of the injunction." *Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256, 257 (6th Cir. 1968). In the election law context, "[t]hese [four] factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together," as opposed to each one imposing a distinct evidentiary burden on the

Plaintiffs.  *Northeast Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir.

2006) (stating, "[f]or example, the probability of success that must be demonstrated is inversely

proportional to the amount of irreparable injury the movants will suffer absent the stay").[22]

### D.  Law and Analysis

Plaintiffs bring their constitutional claims under 42 U.S.C. § 1983.  A claim under 42

U.S.C. § 1983 has two elements: (1) the defendant must be acting under the color of state law;

and (2) the offending conduct must deprive the plaintiff of rights secured by federal law.  *See*

*League of Women Voters*, 548 F.3d at 475.  There is no dispute that the Secretary acts under the

color of state law when enforcing Ohio's election laws.  The dispute here is over whether his

actions and/or directives deprive Plaintiffs' members of their constitutional rights.

### 1.  Likelihood of Success on the Merits

As the Supreme Court has recognized, "[e]specially since the right to exercise the

franchise in a free and unimpaired manner is preservative of other basic civil and political rights,

any alleged infringement of the right of citizens to vote must be carefully and meticulously

scrutinized."  *Reynolds v. Sims*, 377 U.S. 553, 562 (1964); *see also Harper v. Va. Bd. of*

*Elections*, 383 U.S. 663, 670 (1966) (stating that restrictions on fundamental rights must be

"closely scrutinized and carefully confined").

Recent experience proves that our elections are decided, all too often, by improbably slim

margins—not just in local races, *see e.g.*, *Hunter I*, 635 F.3d at 222, but even for the highest

national offices.  *See, e.g.*, *Bush v. Gore*, 531 U.S. 98 (2000).  Any potential threat to the

---

[22] In any event, the Secretary does not dispute that the prospective injury to Plaintiffs in this case—the complete denial of an individual's right to vote—is irreparable.  *See, e.g.*, *Miller v. Blackwell*, 348 F. Supp. 2d 916, 922 (S.D. Ohio 2004).

integrity of the franchise, no matter how small, must therefore be treated with the utmost seriousness. The Supreme Court has expressed its confidence that "the possibility that qualified voters might be turned away from the polls would caution any district judge to give careful consideration to the plaintiffs' challenges." *Purcell*, 127 S. Ct. at 7.  This Court, most assuredly, will not allow the integrity of the franchise to be sullied.

### a.  *Equal Protection*

Plaintiffs bring both facial and "as-applied" equal protection challenges to Ohio's provisional ballot-counting laws.  First, Plaintiffs claim that the application of Ohio Rev. Code § 3505.183(B)(4) to disqualify provisional ballots of lawfully-registered voters given the wrong-precinct ballot by poll workers or whose ballots contain technical errors, imposes a "severe burden" on the right to vote that is not supported by any compelling or legitimate state interest. Second, Plaintiffs claim that in light of the Decree, Ohio's law arbitrarily treats provisional ballots disparately based on the type of identification provided by the voter, in violation of equal protection.  Third, Plaintiffs claim that the evidence shows that Ohio's system for processing provisional ballots subjects provisional voters to significantly differing rates of poll-worker error based on the precinct or county in which they reside, resulting in arbitrary and unequal treatment that has a disproportionate effect on urban voters.

The Secretary maintains that the incidental burdens imposed by Ohio law's disqualification of all wrong-precinct ballots do not rise to violations of equal protection, and do not constitute "severe burdens" on the right to vote.  The Secretary argues that the precinct rule is a reasonable, nondiscriminatory restriction that applies uniformly to all voters, and as such requires only a rational basis.  Under this rational basis review, the Secretary contends that the rule is permissible and within the State's prerogative of running fair and efficient elections.  The

Secretary claims that Plaintiffs' evidence fails to provide reliable information about poll-worker error and does not establish that wrong-precinct ballot rejections undermine the integrity of the election.  Further, the Secretary refutes Plaintiffs' evidence of a disparate impact on the rates of disqualified ballots in urban counties.

This Court analyzes Plaintiffs' claims under the same standards developed by the Supreme Court for equal protection challenges to state election laws, and applied by the Sixth Circuit in *Hunter*.  The Supreme Court most recently held in *Crawford v. Marion County Election Board*, that "a court evaluating a constitutional challenge to an election regulation [must] weigh the asserted injury to the right to vote against the 'precise interests put forward by the State as justifications for the burden imposed by its rule.'"  553 U.S. 181, 190 (2008) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).  A "severe" restriction on the right to vote can only be "justified by a narrowly drawn state interest of compelling importance," *id.*, whereas "when a state election law provision imposes only reasonable, nondiscriminatory restrictions" on constitutional rights, "'the State's important regulatory interests are generally sufficient to justify' the restrictions."  *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson*, *supra,* at n.9).

There is generally no "litmus test for measuring the severity of a burden that a state law imposes on a political party, an individual voter, or a discrete class of voters," *Crawford*, 553 U.S. at 191, but the Court concluded in *Crawford* that "even rational restrictions on the right to vote are invidious if they are unrelated to voter qualifications," warranting stricter scrutiny.  *Id.* at 189 (relying on *Harper v. Virginia Bd. of Elections*, 383 U.S. 663 (1966) (involving a poll tax)).  Any burden a state law places on the right to vote, no matter how "slight that burden may appear, as *Harper* demonstrates, it must be justified by relevant and legitimate state interests

23

'sufficiently weighty to justify the limitation.'"  *Crawford*, 553 U.S. at 191 (quoting *Norman v. Reed*, 502 U.S. 279, 288–89 (1992)).

In addition, the Equal Protection Clause protects a citizen's right to vote from "arbitrary and disparate treatment." *See Hunter I*, 635 F.3d at 233 n.13 (citations omitted).  Each qualified voter in the State has an individual fundamental constitutional right to vote on equal terms with every other. *See Bush v. Gore*, 531 U.S. 98, 104–05 (2000) ("The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another.").

For each of Plaintiffs' claims, "after identifying the burden" imposed by the provisions of Ohio law on the "discrete class of voters," the Court "must identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule, and then make the hard judgment" of whether the Secretary has advanced "relevant and legitimate state interests [that are] 'sufficiently weighty to justify the limitation.'"  *Crawford*, 553 U.S. at 189–91 (additional citations omitted).

### i.  First Equal Protection Claim (Wrong-Precinct Ballot Prohibition)

Plaintiffs' chief claim for relief alleges that Ohio Rev. Code § 3505.183(B)(4)(a)(ii) "severely" burdens the right to vote by mandating the rejection of lawfully-registered voters' provisional ballots when the poll worker errs by providing the voter with a ballot for the wrong precinct.  (*See* SAC ¶ 79.)  Plaintiffs argue the State has provided no legitimate interest, let alone a compelling interest, to justify the law's arbitrary disenfranchisement.  The Secretary claims that the restrictions imposed by Ohio's provisional ballot laws are not "severe," and justifies the

24

strict prohibition on all wrong-precinct ballots as "a 'reasonable, nondiscriminatory restriction' that is necessary for the efficient and fair conduct of the election."[23]

*(a) Identifying the burden imposed by the Ohio law*

Much of the factual basis upon which the Court relies for its findings is uncontested, or has already been established by this Court or the courts in *Hunter*. Additionally, Plaintiffs have submitted a substantial amount of statewide ballot counting and rejection data, statistical reports, and documentary evidence, sufficient to establish a strong likelihood that in the past few statewide elections poll-worker error has resulted in the disqualification of hundreds—if not thousands—of wrong-precinct provisional ballots cast by otherwise lawfully-registered voters.

That poll workers err—and will continue to err in 2012—by providing qualified voters with wrong-precinct ballots is not a contested matter. The Secretary does not dispute the factual reality that in each of the recent statewide elections, registered voters arriving at the correct polling place have had their provisional ballots disqualified for being cast in the wrong precinct.[24] According to the data gathered from the county boards of elections pursuant to the Secretary's directives,[25] in the most recent (non-Presidential) general election in 2011 a total of 3,380 wrong-precinct provisional ballots were given by poll workers to Ohio voters who arrived at their correct polling places.[26] Of this group of wrong-precinct provisional ballots, 1,826 were summarily disqualified as required under Ohio Rev. Code § 3505.183(B)(4)(a)(ii) and another

---

[23] Secretary Opp. at 13.

[24] *See infra* note 42.

[25] *See* "Absentee and Provisional Ballot Information," accessible at
http://www.sos.state.oh.us/SOS/elections/Research/electResultsMain/2011results/absenteeandprovisional.aspx.

[26] Kimball Report, at 23 (Table 15); Declaration of Jusztina Traum, Ex. DD, Dkt. 24, ¶ 33.

1,554 were counted only as a result of the *NEOCH* Decree's requirements.[27]  While the number and frequency of wrong-precinct ballot disqualifications vary county to county, the problem as a whole is systemic and statewide.[28]

There is reason to believe that the number of wrong-precinct ballots will be even higher in the upcoming November 2012 election, due to the inevitable increase in voter turnout for every presidential election compared to the 2011 "odd-year" election.[29]  There is, then, a high statistical probability that in the upcoming election thousands of lawfully-registered voters will arrive at the correct polling place only to receive a provisional ballot from the poll worker for the wrong precinct.  Under *Painter*, those ballots will be rejected in the same manner as in the past— that is, unless the law is enjoined such that all provisional ballots are protected from disqualification due to poll-worker error, not just the ones covered under the Decree.

The Secretary contends that the evidence suggests the problem of wrong-precinct provisional ballot rejection is "improving," relying on the statistics showing that the percentage of total rejected provisional ballots statewide declined from 2008 to 2010.[30]  Plaintiffs effectively refute any demonstrable improvement between 2008 and 2010, however, through the more

---

[27] The Secretary did not begin requiring Boards to separately report the number of wrong-precinct/correct location, and wrong-precinct/wrong-location provisional ballots until the 2011 general election, *see* Kimball Report, at 22.

[28] In the last presidential election in 2008, nearly every Ohio County reported at least one instance of rejecting a provisional ballot cast in the wrong precinct.  Kimball Report, Table 13.  In 2010, a non-presidential year, slightly fewer counties—but still the great majority—reported rejections of wrong-precinct provisional ballots.  *Id.*, Table 14.  In 2011, an "odd-year" and non-presidential election, where we have even more isolated rejection data from the Boards, the majority of counties still reported rejections specifically of wrong precinct/correct polling place provisional ballots.  *Id.*, Table 15.  That wrong-precinct/correct polling place rejections occurred in fewer counties in 2011 is expected, as many counties have only a few multi-precinct polling places, which are the only locations in which the wrong-precinct/correct location type of rejection can occur.  *See* Theye Decl., Exh. A.

[29] *See* Kimball Decl. Ex. B at 2–4 (showing that the rate of provisional voting in high-turnout Presidential election years increases).

[30] Secretary Opp. at 9.

relevant statistics showing the rejected *wrong-precinct* provisional ballots at issue in this case, as a percentage of total rejected provisional ballots, actually *increased* from 2008 to 2010. The number of wrong-precinct provisional ballots statewide (14,355) were 36% of the 39,989 total rejected provisional ballots in 2008, compared with 45% (5,309) of the 11,775 total rejected provisional ballots statewide in 2010.[31] Moreover, the obvious explanation for a decrease in *total* rejected provisional ballots after 2008 is the implementation of the Decree's orders, which beginning with the 2010 statewide election significantly reduced wrong-precinct disqualifications due to poll-worker error.[32] For the remaining rejected wrong-precinct ballots, no improvement has been demonstrated.

At oral argument, counsel for the Secretary made open-ended assertions of "gaps in the Plaintiffs' evidence" of poll-worker error;[33] however, the Secretary does not refute the accuracy of any particular set of data regarding the provisional ballot rejection rates obtained from the Boards.[34] Instead, the Secretary contends that the Plaintiffs' evidence of the poll-worker error problem is "stale," and cannot be relied upon to predict similar rates of wrong-precinct rejections in the upcoming 2012 election. Specifically, the Secretary points to the recent directives issued in the past year which: (1) require that all poll workers be trained (or retrained) within 60 days before the November 2012 election in directing wrong-precinct voters to the right place[35] and

---

[31] *See* Kimball Report, Table 13; Tables 3, 10; and Tables 4, 11, 14, respectively.

[32] *Id.* Ex. B at 23 (Table 15); Traum Decl., Ex. DD.

[33] Transcript of Oral Proceedings, July 30, 2012, 12-cv-562, 52:1–8.

[34] To do so would be somewhat hypocritical, as much of the most reliable and specific data, such as the 2011 county-by-county breakdowns of wrong-precinct rejections by type, for example, were gathered pursuant to the Secretary's directives, and are posted on the Secretary's official website.

[35] *See* Directive 2012-15.

27

proper completion of the provisional ballot requirements;[36] (2) require the simplification of the provisional ballot envelope and affirmation form;[37] and (3) detail the process of how provisional ballots must be processed under Ohio law and the Decree.[38]

The State's efforts in poll-worker training and simplifying the provisional voting procedures and ballot forms are well-taken by this Court, but these measures alone do not address the basic problem demonstrated by the Plaintiffs. The Secretary issued numerous training directives regarding provisional ballots in prior years, too, without any apparent improvement in wrong-precinct poll-worker error.[39] After the data are compiled from the upcoming election, the Court's final review of the full record may reveal an improvement in the numbers of wrong-precinct provisional ballots. At this stage, however, Plaintiffs' evidence is more than sufficient to establish a defined class of provisional voters likely to be disenfranchised because of poll-worker error in the manner alleged by Plaintiffs. *See Certified Restoration*, 511 F.3d at 542 (stating, "a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits") (internal quotation marks omitted).

The evidence further confirms that, of the thousands of rejected wrong-precinct/correct location provisional ballots, the vast majority will be disqualified as a result of poll-worker

---

[36] *Id.*

[37] *See* Ohio SOS Form 12-B.

[38] *See* Directive 2012-01.

[39] *See supra*, note 31.

error.[40]   If the poll worker follows his statutory mandate, a prospective voter may only be permitted to cast a wrong-precinct provisional ballot after having been directed to the *correct* precinct, *and* informed by the poll worker that casting the wrong-precinct ballot will result in her vote not being counted.  *See* Ohio Rev. Code §3505.181(C)(1)–(2).  It is common sense that no rational voter who arrives at the correct polling place would ever *refuse* to cast a provisional ballot in the correct precinct, and that logical conclusion is borne out by the evidence.  No party has identified a single example, from the past four years' elections, of a wrong-precinct provisional ballot being cast because the voter refused to vote in the correct precinct.  Every documented instance in the record of a correct location/wrong-precinct ballot being disqualified was the result of the poll-worker failing in his or her statutory duty to "ensure that voters . . . are given the correct ballot and vote in the correct precinct."  *Hunter I*, 635 F.3d at 243.

Counsel for the Secretary insisted at oral argument that poll workers cannot be blamed for every wrong-precinct provisional ballot that is cast, and asserted that other explanations exist for why a voter might receive and cast a wrong-precinct ballot.[41] Counsel for the Secretary admitted, however, that at this stage in the litigation, his proffered alternative reasons to explain wrong-precinct provisional ballots are merely speculative.[42]  *See also Hunter I*, 635 F.3d at 237

---

[40] Recall, the State has defined "poll-worker error" as "'when a poll worker acts contrary to or fails to comply with federal or Ohio law or directive issued by the Secretary of State.'"  *Painter*, 941 N.E.2d at 789 (quoting Directive 2010-79).

[41]        THE COURT: Do we have any way of knowing what percentage of instances we have where the poll worker --where the voter transposed a number in the address, or where the poll worker didn't understand what was being told, language barrier, et cetera[?]

MR. EPSTEIN: There's no way to ever document that.

Transcript of Oral Proceedings, July 30, 2012, 12-cv-562, 50:12-25.

[42]        THE COURT: We have evidence that substantiates poll-worker error; is that correct?

(similarly opining, "there may be more explanations for why the voter might have erred at the multiple-precinct polling locations than at the Board office, requiring a greater inference to conclude that the miscast ballot was a result of poll-worker error, but Defendants have not presented any persuasive rationales").

   The Sixth Circuit has already affirmed that when a lawfully-registered voter casts a wrong-precinct provisional ballot that was mistakenly given to him by the poll worker, Ohio law disqualifies that ballot "due to poll-worker error." *See id.*, 635 F.3d at 242–44.  Based on the record evidence provided thus far, the Court must find that Plaintiffs have established a strong likelihood that thousands of lawfully-registered voters will be completely deprived of their right to vote under Ohio Rev. Code § 3505.183(B)(4)(a)(ii) in the upcoming election because of poll-worker error.  Although states have broad authority to impose reasonable restrictions in election laws, *see Anderson*, 460 U.S. at 788, such a burden on the right to vote must be justified by sufficient interests to pass constitutional muster.  *See Crawford*, 553 U.S. at 190–91.

   The Secretary does not dispute that Ohio's precinct eligibility requirement imposes some restrictions on the right to vote, including by disqualifying wrong precinct provisional ballots. Rather, the Secretary's primary position in defense of Ohio's prohibition on counting wrong-

---

MR. EPSTEIN: There's no question, Your Honor, that poll-worker error does occur, that poll workers sometimes give the wrong ballots, misdirect the voters.

THE COURT: Do we have statistical evidence that bears out the other examples that you've just given me?

MR. EPSTEIN: Unfortunately, as I said, the nature of what I just put forward would not produce evidence. But what I would suggest is that there is a gap in the evidence that the plaintiffs have presented because they show wrong-precinct rejection rates in the hundreds, and then when you look at their specific log books from the poll workers, they will say, Oh, I gave out three wrong-precinct ballots, I gave out one. So all of these admissions of poll-worker error that they've identified clearly don't account for the scope of the problem. Something else is going on that may not be poll-worker error.

Transcript of Oral Proceedings, July 30, 2012, 12-cv-562, 51:12–52:8.

precinct ballots cast due to poll-worker error is that its restriction on voters' rights is not a severe burden, and is justified by the State's interests in running elections fairly and efficiently.

Relying primarily on the Supreme Court's decision in *Burdick* for support, the Secretary argues that strict scrutiny review does not apply to Ohio's prohibition on wrong-precinct ballots, as Plaintiffs contend it should, simply because a small number of voters' provisional ballots will be disqualified as a result. *See Burdick*, 504 U.S. at 432–34 (stating, "to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to ensure that elections are operated equitably and efficiently"). While the Secretary admits that no regulation is perfect, he claims the burdens imposed by the wrong-precinct ballot prohibition are "reasonable, nondiscriminatory" constraints "necessary for the efficient and fair conduct of the election."[43]

The Secretary is correct that the Court will not require an election regulation to satisfy strict scrutiny simply because violating it results in the loss of the right to vote. *See id.* The Secretary is incorrect, however, in claiming that the severity of the burden imposed by the restriction challenged in this case should be viewed in the aggregate.[44] In an equal protection challenge to an election law, courts must evaluate the reasonableness of the law's particular burden on the individuals whose voting rights are allegedly violated by it. Where, as here, a discrete class of prospective voters challenges a regulation's restriction on their right to vote, the burden must be evaluated according to its impact upon *those* plaintiffs, not the entire electorate.

The Supreme Court in *Burdick*, consistent with its approach from *Anderson*, mandates that:

---

[43] Secretary Opp. at 13.

[44] *See* Secretary Opp. at 12; *see also infra*, note 47.

> [A] court considering a challenge to a state election law must weigh "the
> character and magnitude *of the asserted injury* to the rights protected by the First
> and Fourteenth Amendments *that the plaintiff seeks to vindicate*" against "the
> precise interests put forward by the State as justifications for the burden imposed
> by its rule," taking into consideration "the extent to which those interests make it
> necessary to burden the plaintiff's rights."

*Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789) (emphasis added).  In determining

whether the disputed Ohio law meets the requirements of the Constitution, therefore, "the burden

imposed by its rule" prohibiting wrong-precinct ballots must be weighed based on the "character

and magnitude of the asserted injury" to the rights that Plaintiffs seek to vindicate.  *Id.*

Plaintiffs' constitutional challenge to "Ohio's strict provisional ballot law requiring

disqualification of 'wrong precinct' ballots without exception," only seeks to vindicate the rights

of "registered Ohio voters" whose ballots are "rejected for reasons attributable to poll-worker

error."[45]  Plaintiffs have been quite careful expressly to limit the contours of their claims, and the

corresponding requested relief, to make it clear that they do not challenge Ohio's precinct

eligibility requirement *as a whole*, but merely its application to disqualify ballots of registered

voters who are misdirected by poll workers.[46]

As did the petitioners in *Crawford*, Plaintiffs "urge [the Court] to ask whether the State's

interests justify the burden imposed on . . . a narrow class of voters."  *Id*. at 200.  The voters'

constitutional challenge in *Crawford* was ultimately unsuccessful, however, "[g]iven the fact that

petitioners ha[d] advanced a *broad attack* on the constitutionality of SEA 483, seeking relief that

would invalidate the statute *in all its applications*."  *Id*. (emphasis added).  Therein lies the

critical distinction between this case and *Crawford*, which renders the specific failure of the Ohio

---

[45] SAC, ¶ 79.

[46] Transcript of Oral Proceedings, July 30, 2012, 12-cv-562, at 69:16-19; *see also* Plaintiffs' Reply at 2.

law's prohibition here to make an exception for poll-worker error far more susceptible to this Court's intervention.  Plaintiffs do not challenge Ohio Rev. Code § 3505.183(B)(4)(a)(ii)'s precinct eligibility requirement "in all its applications"—only its provision disqualifying wrong-precinct ballots cast due to poll-worker error.

The Secretary insists that the burden must be weighed according to its aggregate impact on the total electorate,[47] reasoning that the "consequence of running afoul of even the most reasonable restriction, such as registration deadlines, is a denial of the ability to vote."[48]  But as a factual matter, it is simply not true that the consequence of every state election restriction is complete denial of the ability to vote, as it is with the Ohio law at issue here.  In *Crawford*, for example, "[t]he severity of that burden [was] mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots that will ultimately be counted."  553 U.S. at 199.

More fatal to the Secretary's aggregate view of the burden is that it does not correspond to the specific restriction challenged by the Plaintiffs here.  It is only appropriate for the Court to weigh the scope of the burden corresponding to the particular legal restriction at issue in this case, not the law as a whole.  Like the Voter ID law challenged in *Crawford*, where, "[f]or most voters who need them, the inconvenience of making a trip to the BMV, gathering the required

---

[47] As expressed by counsel for the Secretary at oral argument:

> MR EPSTEIN: Your question originally had to do with the standard of review to apply. I would emphasize that *Crawford* and the other cases, when they talk about severe burden, they're not talking about the burden on me as the voter whose ballot was rejected. Under that standard, every election regulation would be subject to strict scrutiny. They're talking about the severe burden upon voters in general, the impact upon the election itself. And by any metric, what we're talking about here is very small. This is also, by the way, the problem with their substantive due process claim.

Transcript of Oral Proceedings, July 30, 2012, 12-cv-562, at 52:6-14.

[48] Secretary Opp. at 12 (citing *Burdick*, 504 U.S. at 433).

documents, and posing for a photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting," the Ohio precinct requirement does not pose an unreasonable burden on most voters. As in *Crawford*, "[b]oth evidence in the record and facts of which we may take judicial notice, however, indicate that a somewhat heavier burden may be placed on a limited number of persons." *Id.* (concluding, "[i]f we assume, as the evidence suggests, that some members of these classes were registered voters when SEA 483 was enacted, the new identification requirement may have imposed a special burden on their right to vote").

It is the particular burden imposed by Ohio's prohibition of wrong-precinct ballots on the rights of a "discrete class of prospective voters"—those who arrive at the correct polling place but are misdirected due to poll-worker error—against which the State's asserted interests must be weighed. *See id*. at 191, 199.[49]

### (b) Whether the restriction is justified by sufficient state interests

The burden Ohio's wrong-precinct ballot prohibition imposes on "the *plaintiff's* rights,"[50] *Burdick*, *supra* (emphasis added), could hardly be any more severe. The Secretary is accurate in

---

[49] In *Crawford*, the Supreme Court found that "on the basis of the evidence in the record it is not possible to quantify either the magnitude of the burden or the portion of the burden imposed on [voters who cannot afford or obtain a birth certificate and who must make a second trip to the circuit court clerk's office after voting] that is fully justified." *Id.* (reasoning that, "[f]irst, the evidence in the record does not provide us with the number of registered voters without photo identification . . . [and] [f]urther, the deposition evidence presented in the District Court does not provide any concrete evidence of the burden imposed on voters who currently lack photo identification").

Unlike in *Crawford*, this Court has been provided with reliable statistics of the number of registered voters disqualified for having wrong-precinct provisional ballots. Furthermore, unlike the relatively unclear degree of the burden imposed on the prospective voters by the photo ID requirement in *Crawford*, the Secretary concedes that wrong-precinct ballots of registered voters who arrive at the correct polling place have been and will continue to be disqualified by the restriction challenged here. *See* Secretary Opp. at 13. This Court, therefore, is able properly to "conclude that the statute imposes 'excessively burdensome requirements' on [a] class of voters." *Id.* at 202.

[50] The "plaintiffs" in this case are the prospective members of the Plaintiff labor unions and political organizations who stand to be disenfranchised under the disputed Ohio regulations due to poll-worker error. *See Sandusky*, 387

contending that this class of prospective voters represents a very small percentage of the total voters in absolute terms.[51]  But for each of the potentially thousands of voters whose wrong-precinct ballots are disqualified under this provision of the election code due to poll-worker error, Ohio's strict prohibition imposes a severe burden on their right to vote—i.e. summary, arbitrary, and irreversible rejection of their entire ballot without notice.[52]  *See Hunter I*, 635 F.3d at 243 (stating that this "state law penalizes the voter when a poll worker directs the voter to the wrong precinct, and the penalty, disenfranchisement, is a harsh one indeed").

The State can only justify imposing such a severe burden against counting these individuals' ballots by supporting it with "precise," "legitimate" interests that are "weighty" enough to supersede "the voters' strong interest in exercising the fundamental political right to vote." *See Crawford*, 553 U.S. at 190–91; *Hunter I*, 635 F.3d at 243.  The Secretary has failed to articulate any state interest or combination of interests "sufficiently strong to require us to reject [Plaintiffs'] attack on the statute," *Crawford*, 553 U.S. at 204.  In fact, to the extent that the State

F.3d at 574 ("The individual participation of an organization's members is not normally necessary when an association seeks prospective or injunctive relief for its members.") (citations omitted).  While impossible to identify at this time, as stated by the Sixth Circuit:

> [Plaintiffs] have not identified specific voters who will seek to vote at a polling place that will be deemed wrong by election workers, but this is understandable; by their nature, mistakes cannot be specifically identified in advance. Thus, a voter cannot know in advance that his or her name will be dropped from the rolls, or listed in an incorrect precinct, or listed correctly but subject to a human error by an election worker who mistakenly believes the voter is at the wrong polling place. It is inevitable, however, that there will be such mistakes.

*Id.*

[51] For example, Dr. Kimball's Report illustrates that the statewide rejection rate of provisional ballots for *any* reason in 2010 varied from a maximum of 0.6% in Cuyahoga County to lower numbers such as 0.02% in Wayne County and 0.03% in Coshocton County as a percentage of total ballots cast in the election.  Kimball Report, Table 11.

[52] Unlike *Crawford*'s challenged Indiana photo ID requirement, for example, where "[t]he severity of that burden [wa]s, of course, mitigated by the fact that, if eligible, voters without photo identification may cast provisional ballots that will ultimately be counted," here the burden is upon provisional ballots; thus no such mitigating factors exist to rectify the prospective disenfranchisement of otherwise eligible voters.

35

has demonstrated any legitimate justifications at this stage for its blanket disqualification of

wrong-precinct ballots of registered voters, they are largely obviated by Plaintiffs' narrowly-

tailored requested injunction, and, in any case, they do not outweigh the Plaintiffs' and the

public's interests in counting ballots of lawfully-registered citizens "whose only error was

relying on poll-worker instructions."  *Hunter I*, 635 F.3d at 243.

The "precise interests offered by the State as justifications for the burden imposed by its

rule," *Crawford*, 553 U.S. at 190, are not precise at all in this case.  After citing to decisions

finding various state election laws reasonable,[53] the Secretary merely *asserts* that the burden

imposed by the regulation here is of the general category considered acceptable under

*Anderson*.[54]  Even if the cases cited by the Secretary were controlling, or contained analogous

restrictions,[55] the law requires considerably more from the State than unsupported citations to

other examples of apparently reasonable election laws to prevail in "the hard judgment that our

adversary system demands" from the Court in these important challenges.  *Crawford*, 553 U.S. at

190.

---

[53] *See, e.g., Broyles v.* Texas, 618 F. Supp. 2d 661 (S. D. Tex. 2009) (finding statute prohibiting nonresident property owners from participating in municipal election did not violate equal protection); *ACORN v. Bysiewicz*, 413 F. Supp. 2d 119 (D. Conn. 2005) (upholding Connecticut's requirement that voters register at least seven days before the general election); *Rosario v. Rockefeller*, 410 U.S. 752 (1973) (finding that New York's eight-month deadline for registering did not severely burden constitutional rights); *League of Women Voters of Florida v. Browning*, 575 F. Supp. 2d 1298 (S.D. Fla. 2008) (finding reasonable under the First Amendment a regulation holding advocacy groups responsible for turning in voter registrations late); *Coalition for Free & Open Elections v. McElderry*, 48 F.3d 493 (10th Cir. 1995) (banning write-in candidates for president); *Friedman v. Snipes*, 345 F. Supp. 2d 1356 (S.D. Fla. 2004) (holding state's deadline for returning absentee ballots did not unconstitutionally disenfranchise a class of voters); *Clingman v. Beaver*, 544 U.S. 581 (2005) (upholding Oklahoma's semiclosed primary system).

[54] *See* Secretary Opp. at 13 (arguing, "[i]n this case, the prohibition on 'wrong-precinct' ballots is a 'reasonable, nondiscriminatory restriction' that is necessary for the efficient and fair conduct of the election").

[55] The burdens imposed by the restrictions in the cases cited by the Secretary, to provide just one example, lack the critical character of *arbitrariness* represented by poll-worker error rejections, which is the gravamen of the unjust nature of the restrictions alleged by Plaintiffs, throughout.

The only other "interests" the Secretary submits on behalf of the State to justify the burden imposed by the strict wrong-precinct prohibition is the following list of general "advantages of the precinct system" excerpted from the Sixth Circuit's decision in *Sandusky*:

> (1) it [the precinct system] caps the number of voters attempting to vote in the same place on election day;
>
> (2) it allows each precinct ballot to list all of the votes a citizen may cast for all pertinent federal, state, and local elections, referenda, initiatives, and levies;
>
> (3) it allows each precinct ballot to list only those votes a citizen may cast, making ballots less confusing;
>
> (4) it makes it easier for election officials to monitor votes and prevent election fraud; and
>
> (5) it generally puts polling places in closer proximity to voter residences.

(*See* Secretary Opp. at 13) (quoting *Sandusky*, 387 F.3d at 568–69).

The first, third, and fifth "advantages" listed in *Sandusky* are irrelevant to the election restriction challenged here.  The State's interests in: (1) capping the number of voters at a given location on election day; (3) making ballots less confusing for citizens; and (5) locating polling places in closer proximity to voters, are each legitimate ends met by the precinct system, but are not related to the law's restriction against counting wrong-precinct provisional ballots.[56]  Hence, only the second and fourth of these *Sandusky* interests are even remotely relevant to justifying the burden imposed by the post-hoc disqualification of wrong-precinct provisional ballots cast by registered voters.

---

[56] Refusing to count correct location/wrong-precinct provisional ballots does not affect the number of voters arriving at a given location, because by definition the ballots at issue were cast at the correct designated polling place.  Nor does it affect how the state chooses its polling locations.  Finally, the restriction does have the potential to make things any less confusing for voters.  Indeed, knowing that one's provisional ballot might be disqualified due to the poll worker's mistake, if anything, only makes the provisional ballot *more* confusing to citizens.

The State's second *Sandusky* interest, "allow[ing] each precinct ballot to list all of the votes a citizen may cast for all pertinent federal, state, and local elections . . .," if given a cursory analysis, may be served by the strict prohibition of wrong-precinct ballots.  As discussed in greater detail in the Court's analysis of the balancing of harms equitable factor, *infra*, prohibiting wrong-precinct ballots does prevent the potential for "split-precinct" vote dilution—i.e. votes being erroneously counted for precinct-specific electoral races for which the individual is not registered to vote, resulting in the dilution of the votes of the registered voters from that precinct. In recognition of this potential problem, Plaintiffs' requested relief is specifically tailored to require that only so-called "up-ballot" votes are to be counted on the eligible wrong-precinct ballots.  This ensures that any votes cast in a precinct for which the voter is not registered will not be counted,[57] thus practically eliminating the "vote dilution" problem.  Additionally, since 2010 the Decree has required the Boards to "re-make" provisional ballots where necessary, without any apparent adverse effect on the administration of the Ohio precinct system.

The fourth *Sandusky* interest given by the Secretary, the need to monitor votes and prevent "voter fraud," cannot possibly serve as even a "rational basis" for prohibiting identified, *lawfully-registered* voters' ballots from being counted.  The Ohio statute requires Boards to invalidate provisional ballots cast by individuals in the wrong precinct only *after* first determining that those voters are lawfully-registered voters. Ohio Rev. Code § 3505.183(B)(4)(a)(i)–(ii).  Categorically, for the prospective voters seeking to vindicate their rights in this case, there can be no risk of "in-person voter impersonation at polling places," *Crawford,* 553 U.S. at 195, or any other form of voter fraud, that disqualifying their ballot could

---

[57] *See* Plaintiffs' Second Modified Proposed Order, at 2 (requiring the Boards to count only "the votes cast on the provisional ballot . . . in all races and for all issues for which the voter would have been eligible to vote if he/she had cast the ballot in the correct precinct").

possibly prevent.  The Board must by law verify their identity and that they are otherwise qualified to vote.

The State does have a legitimate "interest in orderly administration and accurate recordkeeping" in the election process, *see id*, which could conceivably fall under the stated interest in "monitoring" the election.  Without any specific evidence showing how these interests justify disenfranchisement of registered provisional voters' ballots, which must already be evaluated by the Board for eligibility after the election, *see* Ohio Rev. Code § 3505.183, it is very difficult for the Court to see how the interests of "orderly administration" or "accurate recordkeeping" is furthered by prohibiting these provisional ballots from being counted.  The Court appreciates that depending on the how the system is ultimately adapted to protect against poll-worker error rejections, it could make the Boards' *existing* post-election duties more difficult.  Under the Decree, however, Boards are already tasked with determining whether poll-worker error caused the wrong-precinct ballot, and the Court doubts the State would dispute that some degree of additional time and resources is warranted when the alternative is the disenfranchisement of thousands of voters.

In sum, the Secretary's reliance on the general advantages of Ohio's precinct-based voting system, and the State's ability to pass reasonable regulations in the interest of conducting fair and efficient elections, falls short of what is required to justify its inevitable disenfranchisement of thousands of qualified voters in the November 2012 election.  The Sixth Circuit has affirmed that the Ohio prohibition on wrong-precinct ballots unjustly restricts qualified voters by failing to make exceptions for poll-worker errors, *see Hunter I*, 635 F.3d at 243, and the Plaintiffs have submitted reliable, uncontroverted evidence demonstrating that a

discrete class of prospective voters will be severely burdened by this feature of the law in the upcoming election.

<em>(c) The restriction fails review for invidiousness</em>

In addition to the foregoing "*Anderson* balancing" of the State's justifications for the restriction against the plaintiffs' rights,  the Supreme Court has expressly preserved the prior rule from *Harper*, which prohibits States from placing restrictions on the right to vote that "invidiously discriminate" by virtue of being "unrelated to voter qualifications."  *Id.* (citing *Harper*, 383 U.S. at 666–67 (deeming poll tax "invidious"); *Carrington v. Rash*, 380 U.S. 89 (1966) (holding, "the Texas Constitution imposes an invidious discrimination" by its "presumption of nonresidence" of soldiers, as a class of voters)).  This "stricter standard" applied to "invidious" restrictions is appropriate in the Court's review of Ohio's restriction on the rights of the prospective provisional voters in this case because Ohio's prohibition on wrong-precinct ballots cast due to poll-worker error is "unrelated to voter qualifications," *Crawford*, 553 U.S. at 189.

The challenged election restriction disqualifies wrong-precinct ballots cast by individuals who, by law, the Board has already deemed are lawfully-registered to vote.  Ohio Rev. Code § 3505.183(B)(3)(b).  The law's requirement that these voters' ballots be disqualified when they cast a wrong-precinct ballot due to poll-worker error is, by definition, unrelated to "voter qualifications," because the voters have necessarily met the all the State's requirements for eligibility.  It is only through an error by the poll worker that the voter's ballot is ineligible, and an error by the poll worker can hardly be said to be related to the "*voter's* qualifications," *Crawford*, 553 U.S. at 189.

40

Again, Ohio's precinct requirement, as a whole, is legitimate and relevant to the requirement that voters vote in their jurisdiction.  The Plaintiffs sue on behalf of registered voters who arrive in the correct polling place, and only through an intervening error violate the precinct requirement.  As a class, these voters have no deficiencies in their qualifications; thus, the State's expansion of the wrong-precinct prohibition to them is an invidious restriction.  This is not an archetypical case of an invidious restriction, such as poll taxes, which are facially "capricious." *Harper*, 383 U.S. at 668.  Like poll taxes, however, any rational basis for rejecting wrong-precinct ballots of registered voters due to poll-worker error is equally unreasonable.[58]  And the Supreme Court in *Carrington* affirmed that a regulation may be invidious in its restriction on a particular class of voters.  *See Carrington*, 380 U.S. at 93 (where the "State is dealing with a distinct class" of voters (servicemen) disenfranchised under its residency requirement).  The restriction imposed by Ohio's wrong-precinct ballot disqualification is unrelated to the prospective Plaintiffs' voter qualifications and constitutes an "invidious" restriction prohibited under *Harper*, irrespective of whether it is rational from the State's perspective.

Hence, the Plaintiffs are likely to prevail under either of these alternative tests.  Under both *Anderson* interests balancing and *Harper*'s "invidiousness" standard, the State's interests in administrative costs savings and avoiding "inefficiencies" furthered by the law's blanket

---

[58] This conclusion mirrors the Supreme Court's reasoning in *Crawford*, where even a "benign" regulation nonetheless bordered on invidious in its restriction on the class of voters.  The *Crawford* Court reasoned:

> The State's requirements here, that people without cars travel to a motor vehicle registry and that the poor who fail to do that get to their county seats within 10 days of every election, likewise translate into unjustified economic burdens uncomfortably close to the outright $1.50 fee we struck down 42 years ago [in *Harper*]. Like that fee, the onus of the Indiana law is illegitimate just because it correlates with no state interest so well as it does with the object of deterring poorer residents from exercising the franchise.

553 U.S. at 236–37.

prohibition on counting wrong-precinct provisional ballots are neither compelling nor sufficiently weighty to justify the arbitrary denial of a significant number of prospective registered voters' "most fundamental of rights." *State ex rel. Skaggs v. Brunner*, 588 F. Supp. 2d 828, 834 (S. D. Ohio 2008); *see also Carrington*, 380 U.S. at 96 ("States may not casually deprive a class of individuals of the vote because of some remote administrative benefit to the State."). *Painter*'s failure to allow an exception for wrong-precinct ballots cast due to poll-worker error, therefore, represents an unreasonable restriction on lawfully-registered voters' right to vote. Like in *Norman*, "the State Supreme Court's inhospitable reading of [the Ohio Revised Code] sweeps broader than necessary to advance electoral order and accordingly violates" the Equal Protection Clause. *Norman*, 502 U.S. at 290 (citing *Anderson*, 460 U.S. at 793–94; *Williams v. Rhodes*, 393 U.S. 23, 30–34 (1968)).

The Court accepts that mistakes by election officials are inevitable, and the State will never eradicate poll-worker error. As the Sixth Circuit held in *Hunter I*, however, the fact that poll workers will always make mistakes "is no answer to the equal-protection challenge because discriminatory treatment must be justifiable, *see Crawford*, 553 U.S. at 189-90, and *unanticipated* inequality is especially arbitrary." *Hunter I*, 635 F.3d at 238 n.16 (emphasis in original). The Court finds that Plaintiffs have demonstrated a likelihood of success on their primary equal protection claim.

### ii.  Second Equal Protection Claim (Ballot Envelope Deficiencies)

Plaintiffs' second equal protection claim alleges that Ohio's blanket disqualification of provisional ballots where the ballot envelope contains certain "technical deficiencies" imposes a

42

similarly severe burden on the right to vote unjustified by any legitimate State interests.[59]  As with the voters disenfranchised due to wrong-precinct ballots, the Secretary disputes the severity of the burden imposed by Ohio's disqualification of these ballots.  Further, the Secretary claims that the Plaintiffs' concerns regarding this class of disqualified ballots have been addressed by the Secretary's recent directives requiring, *inter alia*, that Boards may not reject provisional ballots where the poll worker's information on the ballot envelope is incomplete.[60]

In 2011, the Boards reported rejecting a total of 568 provisional ballots on the basis of technical deficiencies in the ballot envelope.  Those deficiencies include a missing or misplaced printed name or voter signature, or the voter's signature was deemed not to match the exemplar on file with the Board.[61]  Any provisional ballots cast containing these sorts of technical deficiencies necessarily involves poll-worker error because it is the poll worker's duty to ensure that provisional ballots are cast with a validly completed ballot envelope and affirmation.  *See* Ohio Rev. Code §§ 3505.181(B)(2)–(3); 3505.182; *see also Skaggs*, 588 F. Supp. 2d at 836 ("To be sure, where any county board of elections accepts a Provisional Ballot without a complete voter affirmation, including a poll worker verification statement, that situation is attributable to the poll worker's failure to perform his statutorily prescribed role and constitutes poll-worker error.")

The Parties' arguments, and the Court's doctrinal analysis, on this "technical deficiencies" claim is much the same as the analysis on the wrong-precinct ballot claim.  First,

---

[59] Specifically, Plaintiffs challenge the Ohio law "requiring disqualification of ballots when the provisional ballot envelope contains sufficient information for the county to identify the lawfully-registered voter but when that envelope is missing or has a misplaced voter signature or printed name, without exception, as set forth in Ohio Rev. Code § 3505.183(B)(4)(a)(iii), and in the Ohio Supreme Court's decisions of *Painter* and *Skaggs*." SAC ¶ 82.

[60] *See* Directive 2012-01 (Counting Provisional Ballots), p. 4; Directive 2012-15 (Training of Poll Workers).

[61] Traum Decl. ¶ 29; Ex. Z, Table 1; *see also, id.*, Exs. Z–CC (containing data showing rejection of ballots of voters for "no signature," "no printed name," "printed name and/or signature in wrong place").

the Court must identify the restriction on the right to vote. Here, the data demonstrates that a discrete class of registered voters will have their ballots disqualified due to poll-worker error. This class of prospective provisional ballots is likely to be significantly smaller even than those cast in the correct location/wrong-precinct. Nevertheless, "[h]owever slight that burden may appear . . . it must be justified by relevant and legitimate state interests," *Crawford*, 553 U.S. at 191, because even a single vote arbitrarily disqualified without a sufficient justification is an unconstitutional restriction.

In the case of technically deficient ballot envelopes, although the disqualification is still attributable to poll-worker error, the individual voter has a greater degree of control over whether the ballot envelope contains the required elements, and whether to complete the affirmation. In this way, the character of the burden of this restriction is arguably less severe than with wrong-precinct disqualifications, where the poll worker hands the voter an invalid ballot. As with wrong-precinct ballots, it is the poll worker's failure to process the provisional ballot properly that leads to the ballot's disqualification under Ohio Rev. Code § 3505.183(B)(4)(a)(iii). *See Skaggs*, 588 F. Supp. 2d at 836, *supra*. The poll worker—not the voter—is the person legally tasked with confirming the validity of the provisional ballot ensuring the technical processing of the provisional ballot correctly. *See* Ohio Rev. Code § 3505.181(B)(2).

Although it is more difficult to quantify the precise magnitude of the burden imposed by this law's restriction on the class of affected voters, the restriction's unreasonableness is equally clear once the Court has to determine whether the law's disqualification of ballots with technical deficiencies is justified by the State's asserted interests. The Secretary relies on the same generally accepted interests in efficiently regulating elections to justify disqualifying ballots with these technical deficiencies. As before, the State's authority to regulate elections does not justify

44

the harsh restriction on the class of provisional votes at issue, where the Board is able to discern in its regular course that the ballot is cast by a lawfully-registered voter.  *See Anderson*, 460 U.S. at 789 (holding, "the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights").  Indeed, the interests provided by the Secretary with respect to the *Sandusky* factors are even less relevant to this restriction, as these ballots are cast in the correct precinct.

Simply because a specific regulation is part of a state's mostly "reasonable, nondiscriminatory" electoral code does not make it justifiable in all its applications under *Anderson* and *Burdick*.  *See Crawford*, 553 U.S. at 190, n.8 (stating, "*Burdick* surely did not create a novel 'deferential important regulatory interests' standard").  Given the irrelevance and weakness of the Secretary's proffered justifications for the state's requirement that Boards disqualify ballots with technical deficiencies where it is able to otherwise discern that the voter is qualified, the same reasoning provided in the Court's analysis of the wrong-precinct equal protection claim is equally applicable.  Therefore, the Court also finds a likelihood of success on the merits of Plaintiffs' "technical deficiencies" claim.

The Secretary's revised directives do not alleviate the burden of the restriction, and do not moot Plaintiffs' alleged violation, as the Secretary claims.  Directive 2012-01 instructs boards of elections that provisional ballots are not to be rejected only where the *poll worker* fails to fill out his or her portion of the provisional envelope.  The law continues to disqualify provisional ballots with deficient voter signatures or voter affirmations on the ballot envelope, which are the challenged restrictions of Ohio Rev. Code §§ 3505.181(B)(2), 3505.182, in Plaintiffs' claim.[62]

---

[62] *See* Plaintiffs' Motion for Preliminary Injunction, at 29.

iii.     Third Equal Protection Claim (Disparate Impact of Poll-Worker Error by County)

Plaintiffs' fifth claim for relief is more of an "as-applied" equal protection challenge. Plaintiffs claim that Ohio's strict disqualification of wrong-precinct ballots creates a disparate impact on provisional voters, by arbitrarily subjecting voters to differing rates of arbitrary ballot disqualification based upon the county in which they reside.[63]  Specifically, Plaintiffs allege the evidence demonstrates that the result is higher rates of rejections due to poll-worker error in large urban counties with more multidistrict polling places.  This disparately impacts voters residing in urban counties and precincts in violation of their right to vote on equal terms with voters in rural or suburban jurisdictions.

Following the Supreme Court's holding in *Bush v. Gore*, the Sixth Circuit has affirmed that  "[i]n its review of the provisional ballots, the Board must apply specific and uniform standards to avoid the 'nonarbitrary treatment of voters.'"  *Hunter I*, 635 F.3d at 234 (quoting *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 475 (6th Cir. 2008)).  In *Hunter I*, the court found that "the Board has not asserted 'precise interests' that justified the unequal treatment" of provisional ballots.  *Id.* at 238 (quoting *Burdick*, 504 U.S. at 434).  Specifically relating to Plaintiffs' claims, the Supreme Court in *Bush* held that a State may not "accord[] arbitrary and disparate treatment to voters in its different counties."  531 U.S. at 107.  This requirement of equal protection may be violated by an election regulation that imposes a disparate impact.  The disparate impact need not be intentional to be unconstitutional.  *See Hunter I*, 635 F.3d at 234, n.13 (rejecting the Ohio Republican Party's argument that there can be no violation of the Equal Protection Clause without evidence of intentional discrimination).

---

[63] *See* SAC ¶ 91.

46

If the evidence firmly supported Plaintiffs' submission that voters in more populous counties are subjected to a higher chance of being disenfranchised, Ohio's disqualifying wrong-precinct ballots due to poll-worker error would violate equal protection on that basis as well. The Secretary demonstrates, and Plaintiffs acknowledge,[64] that the statistics from the past elections do not establish a consistently higher *rate* of rejected wrong-precinct ballots in urban counties relative to less populous counties. To show the alleged disparate impact of poll-worker error, Plaintiffs rely chiefly on the statistics and conclusions in Dr. Kimball's Report. Using data from the Boards, Kimball shows that in recent years the most populous counties have had a higher proportion of the *total* rejected wrong-precinct ballots.[65]

Showing that the more populous counties have a consistently higher percentage of the total rejected wrong-precinct ballots takes Plaintiffs one step closer to proving their claim. The more important metric for proving a disparate impact on voters on a county-by-county basis, however, is the *rate* of wrong-precinct rejections by county, and that statistic has not been demonstrably higher in urban counties.[66] Without clear evidence that voters will be uniformly disenfranchised under the regulation in more populous counties, the Plaintiffs have not demonstrated a likelihood of success on this alternative equal protection challenge to Ohio's wrong-precinct prohibition.

---

[64] *See* Reply, at 14 n.15.

[65] In 2010, the eight most populated counties accounted for 48 percent of total ballots cast, however those same eight counties accounted for 76 percent of the provisional ballots rejected for being in the wrong precinct or county. Again in 2011, while the eight most populated counties accounted for 46 percent of total ballots cast in the 2011 election, those same eight counties accounted for 79 percent of the provisional ballots rejected for being in the wrong precinct but the correct polling place. Kimball Decl. Ex. B at 11–25.

[66] For example, in 2011, the Cuyahoga County (largest urban county) wrong-precinct rejection rate of 24.4% was eclipsed by rejection rates in rural counties such as Perry (37%), Athens (39.6%), Van Wert (28.6%), and Mercer (40.9%). *See* Kimball Report, Table 14.

iv.  Fourth Equal Protection Claim (Unequal Treatment of Provisional Voters)

Plaintiffs' final equal protection claim alleges that the law's differential treatment of wrong-precinct provisional ballots depending on the form of identification used to identify the voter constitutes unequal disparate treatment in violation of voters' rights.  The Decree mandates that Boards may not reject wrong-precinct ballots due to poll-worker error for individuals who use their last four social security digits to identify themselves at the polls.[67]  Plaintiffs claim that Ohio law's failure to treat other provisional voters' ballots the same—i.e., by counting their wrong-precinct ballots as well—violates equal protection by arbitrarily rejecting some wrong-precinct ballots and not others.[68]  The Secretary argues that to the extent the Decree orders differential treatment of wrong-precinct ballots, it is not the fault of the state's election code.  Moreover, the Secretary points to an allegedly contradictory position taken by Plaintiffs as SEIU condemns the effects of the Decree when SEIU is itself a party to the *NEOCH* litigation.

Plaintiffs' claims in this case and in the *NEOCH* litigation are not contradictory.  While Plaintiffs argue that the Decree's orders are necessary to *avoid* constitutional violations, they also argue that the Decree must be expanded to include all ballots that are cast in the wrong precinct due to poll-worker error.  Indeed, Plaintiffs have consistently advocated for wrong-precinct ballots to be counted any time poll-worker error is the cause.  While the Decree may have covered only a portion of wrong-precinct ballots, it does not demonstrate any change in Plaintiffs' position.

As to the merits, the Ohio Revised Code treats all wrong-precinct ballots the same; none is counted.  *See Painter*, 941 N.E.2d at 794.  In incorporating the Decree, however, Ohio's ballot

---

[67] *NEOCH* Decree ¶ 5.

[68] SAC ¶ 94.

48

counting rules result in disparate treatment of similarly situated provisional voters.  *See id.* (acknowledging the Decree's requirements); *see also NEOCH*, 2012 U.S. Dist. LEXIS 94086, at *35–45 (affirming that Ohio law is not in conflict with the Decree under *Painter*).  Counting the provisional ballots of individuals who use their social-security numbers as identification under different standards from those who use other forms of identification violates the latter voters' "constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."  *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972); *see also League of Women Voters*, 548 F.3d at 477 ("At a minimum . . . equal protection requires 'nonarbitrary treatment of voters.'") (quoting *Bush*, 531 U.S. at 105)).  The Sixth Circuit in *Hunter I* affirmed the likelihood that the Hamilton County Board of Election "arbitrarily treated one set of provisional ballots differently from others, and that unequal treatment violates the Equal Protection Clause."  635 F.3d at 242.  There is no reason for treating provisional ballots differently based on the type of identification used.

    Defendants argue that the appropriate remedy for the violation caused by the law's disparate treatment of wrong-precinct ballots is to stop counting any ballots protected by the Decree, rather than to count all wrong-precinct ballots cast due to poll-worker error.  Both the Sixth Circuit and this Court have rejected that rationale.  *See Hunter II*, 2012 WL 404786, at *46 n.40 ("The cure to this violation requires the Board to count other ballots flawed by poll-worker error . . . . '[I]t is preferable as an equitable matter to enable the exercise of the right to vote . . . .'") (quoting *Hunter I*, 635 F.3d at 245)).  The State's preference to exercise its authority over elections by counting fewer wrong-precinct ballots is inapposite because the violation is of federal constitutional rights.  The Secretary presents very little argument in defense of this claim.  Based upon established principles of equal protection requiring that similar voters be met with

49

similar vote counting standards from the State, the Court finds a likelihood of success on this alternative challenge to Ohio's provisional ballot-counting regime.

### b. Substantive Due Process

Plaintiffs' substantive due process claim mirrors the due process violation affirmed in the *Hunter* Litigation.  Specifically, Plaintiffs' claim that Ohio's law mandating disqualification of ballots of lawfully-registered voters for reasons attributable to poll-worker error violates the Due Process Clause of the Fourteenth Amendment.[69]  *See Hunter I*, 635 F.3d at 243 ("Plaintiffs present the argument that failure to count provisional ballots cast in an incorrect precinct due to poll-worker error violates the Due Process Clause.").  This Court's conclusion in *Hunter* II, that "Ohio's precinct-based voting system . . . is fundamentally unfair and abrogates the Fourteenth Amendment's guarantee of due process of law," establishes a likelihood of success on the merits for this claim.

The Sixth Circuit has held that "[t]he Due Process clause is implicated, and § 1983 relief is appropriate, in the exceptional case where a state's voting system is fundamentally unfair." *Warf v. Bd. of Elections of Green Cty., Ky.*, 619 F.3d 553, 559 (6th Cir. 2010) ("Such an exceptional case may arise, for example, if a state employs non-uniform rules, standards and procedures, that result in significant disenfranchisement and vote dilution.") (internal quotation marks omitted).  With regard to Plaintiffs' due process claim, the *Hunter I* Court stated:

> Ohio has created a system in which state actors (poll workers) are given the ultimate responsibility of directing voters to the right location to vote. Yet, the state law penalizes the voter when a poll worker directs the voter to the wrong precinct, and the penalty, disenfranchisement, is a harsh one indeed. To disenfranchise citizens whose only error was relying on poll-worker instructions appears to us to be fundamentally unfair.

---

[69] SAC ¶ 97.

*Hunter I*, 635 F.3d at 243. Chief Judge Dlott subsequently held, in her well-reasoned opinion in

*Hunter II*, that Ohio's precinct-based voting system:

> delegates to poll workers the duty to ensure that voters are directed to the correct
> precinct but which provides that provisional ballots cast in the wrong precinct
> shall not be counted under any circumstance, even where the ballot is miscast due
> to poll-worker error, is fundamentally unfair and abrogates the Fourteenth
> Amendment's guarantee of due process of law.

2012 WL 404786, at *46.

Although the Court was "without jurisdiction to order a remedy" for the due process

violation in *Hunter*, *see id.*, here, the Attorney General's office is part of this case and has

defended the constitutionality of the Ohio Revised Code more than competently.

The Secretary refutes the law and evidence in support of Plaintiffs' due process claim,

but refuses even to address *Hunter*'s holding that Ohio's provisional ballot law violates due

process. *Id.* Based on the evidence in support of the Court's equal protection analysis, and the

final decision by this Court in *Hunter*, Plaintiffs' due process claim has a strong likelihood of

success on the merits.

## 2. Irreparability of Harm

The prospective harm to Plaintiffs in the upcoming election if the challenged provisions

of the Ohio election code are not enjoined is irreparable. Where, as here, "Defendants'

challenged actions threaten or impair both Plaintiffs' constitutional right to due process and

constitutional right to vote, the Court must find that Plaintiffs will suffer an irreparable injury."

*Miller v. Blackwell*, 348 F. Supp. 2d 916, 922 (S.D. Ohio 2004); *see also Overstreet v.*

*Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) (holding, "a plaintiff

can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based

upon a violation of the plaintiff's constitutional rights").

51

### 3.  Balancing of Harms

The equitable balancing of harms also weighs in favor of granting injunctive relief in this case.  The Court's analysis on this factor is similar to the Court's balancing of Plaintiffs' (i.e. wrong-precinct provisional voters) interests and the State's interests in determining an equal protection violation.  The Secretary claims that the Plaintiffs' proposed injunction will cause more harm than good to the integrity of Ohioans' voting franchise by causing a "cascade" of collateral Equal Protection and Due Process violations on Ohio voters.[70]  The two specific categories of "downstream" constitutional violations the Secretary identifies from the proposed order to count wrong-precinct ballots are: (1) "split-precinct" voter dilution; and (2) the residual disenfranchisement of the same voters in precinct-only electoral races.

Neither of these prospective harms outweighs the benefits from preventing the rejection of thousands of wrong-precinct and technically deficient provisional ballots miscast through poll-worker error.  The Secretary's vote dilution argument, as noted in Section III.B., *supra*, is addressed by Plaintiffs' proposed order, which eliminates the potential for vote dilution by only counting "up-ballot" votes.[71]  Any remaining interests "in preventing the counting of invalid votes must be weighed against the voters' 'strong interest in exercising the fundamental political right to vote.'"  *Hunter I*, 635 F.3d at 243 (quoting *Purcell*, 549 U.S. at 4 (internal quotation marks omitted)).

Second, the Secretary claims that Plaintiffs' proposed counting votes of wrong-precinct ballots only in those races for which that voter is eligible to vote ("up-ballot" races) will still leave the remaining disenfranchisement of the *same* voter who is then unable to vote in all his

---

[70] Secretary Opp. at 18–19.

[71] *See supra* note 57.

52

precinct-specific races.  This argument is without force, at least on the balancing of harms in this

case.  It suggests that the harm to a voter from having lost the opportunity of voting, entirely, is

somehow outweighed by the harm from having lost the opportunity to vote just in precinct-

specific races.  Any voter would rather have some races counted, as under the Plaintiffs'

proposed order, than none at all, as under the Ohio law's blanket prohibition.

### 4.  Public Interest

Finally, the "public interest" factor weighs in favor of counting provisional ballots cast by

registered voters, for reasons already established.  The Sixth Circuit has recognized that,

although "both the state and the voting public have interests at stake," which may conflict at

times, *Hunter I*, 635 F.3d at 244, "it is always in the public interest to prevent violation of a

party's constitutional rights."  *Deja Vu*, 274 F.3d at 400 (internal quotations omitted).  As the

*Hunter I* Court opined in affirming this Court's granting of a preliminary injunction, the State of

Ohio "has a strong interest in [its] ability to enforce state election law requirements."  *Id*.  On the

other hand,

> [m]embers of the public, however, have a strong interest in exercising the
> fundamental political right to vote. That interest is best served by favoring
> enfranchisement and ensuring that qualified voters' exercise of their right to vote
> is successful.

*Hunter I*, 635 F.3d at 244.

Even constitutionally-required judicial intervention into the state's electoral system

should be done with caution, lest the franchise be undermined by the very organs sworn to

protect it.  The Court is acutely aware from elections past that last-minute changes in election

laws can, for example, "generate voter confusion and consequent incentive[s] to remain away

from the polls."  *See id.*  An order from this Court prohibiting the Board from disqualifying

wrong-precinct provisional ballots due to poll-worker error will affect few, if any, changes to the rules and procedures facing poll workers and voters on election day.  An injunction would only affect the Board's procedures in counting provisional ballots *after* the election, at which time voter confusion and deterrence is a non-threat.

Moreover, the experience from the past two years' elections demonstrates that wrong-precinct provisional ballots can successfully be reviewed and counted for poll-worker error, as is currently required for those ballots covered by the Decree.  Thousands of voters have been spared arbitrary disenfranchisement because of the Decree, to which the State and the Secretary are parties.[72]   The Secretary's claims that "the relief Plaintiffs' seek would necessarily alter Ohio's precinct-based voting system" and "potentially fundamentally change voting nationwide,"[73] are unfounded.  Plaintiffs merely seek to protect the remaining qualified voters outside the Decree's scope from being disenfranchised due to poll-worker error.

The Secretary repeatedly maintains that provisional ballots are simply "a last-stitch safety net for people who traditionally would have been turned away completely."[74]  Presumably, attempting to justify even arbitrary disenfranchisement of provisional voters as being merely "collateral damage," with no legal significance.  This outlook belies a fundamentally misguided view that the State need not protect the right to vote of individuals who, for any number of reasons, are required to cast a provisional ballot.   The Supreme Court in *Bush v. Gore* repudiated that position expressed by the Secretary with its holding that "[h]aving once granted the right to

---

[72] *See Northeast Ohio Coalition for the Homeless v. Husted*, No. 06-cv-896, 2012 U.S. Dist. LEXIS 66111 (S. D. Ohio May 11, 2012).

[73] Secretary Opp. at 1.

[74] Transcript of Oral Proceedings, July 30, 2012, 12-cv-562, at 69:18-19.

vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush*, 531 U.S. at 104-05.  And as this Court has previously stated, "it is well-settled that the Constitution protects the right of *all* qualified voters to have their votes counted," even voters who are only deemed qualified upon review of their provisional ballots. *Skaggs*, 588 F. Supp. 2d at 834 (emphasis added); *see also O'Brien v. Skinner*, 414 U.S. 524 (1974).

HAVA prudently left the states to choose how they fashion the "safety net" of provisional ballots, as well as which citizens must rely on their votes being caught by it on election day.  *See Sandusky*, 387 F.3d at 576 (holding, "the ultimate legality of the vote cast provisionally is *generally* a matter of state law") (emphasis added).  Once fashioned, however, the Constitution demands a safety net without holes—or, to be more precise, without any holes which cannot be justified.  *Id.* at 569 (recognizing, while the law gives "primary responsibility for administering and regulating elections to the States, the States must adhere to certain constitutional and statutory requirements").  If this were not the law, states would be free to require every voter to vote "provisionally" and then arbitrarily reject ballots as they pleased with impunity.

The Plaintiffs have demonstrated a likelihood of succeeding on their equal protection challenges to the requirement that the Boards reject wrong precinct provisional ballots cast due to poll-worker error, as required by Ohio Rev. Code §§ 3505.183(B)(4)(a)(ii) and (B)(4)(b)(ii), contained in Claims One and Six of the Second Amended Complaint.  Plaintiffs have also demonstrated a likelihood of success on the substantive due process challenge to the same provision of Ohio law contained in Claim Seven.  Plaintiffs have further demonstrated a likelihood of success on their constitutional challenge to the requirement that Boards reject

55

provisional ballots containing technical deficiencies in the ballot envelope, as required by Ohio

Rev. Code §3505.183(B)(4)(a)(iii), contained in Claim Two of the Second Amended Complaint.

The additional factors of the irreparable nature of the prospective harm to Plaintiffs; the balance

of harm to others; and consideration of the public interest each weigh in further support of

issuing an order enjoining the challenged restrictions on Plaintiffs' members voting franchise.

Based on the foregoing, the Court finds that preliminary injunctive relief is appropriate

and Plaintiffs' Motion for a Preliminary Injunction is **GRANTED**.

### E.  Appropriate Injunctive Relief

The Court determines the following preliminary injunction on the Board's enforcement

of Ohio law to be the appropriate relief, and the least restrictive upon the State, adequate to

ensure the protection of Plaintiffs' constitutional rights in the upcoming election:[75]

It is hereby **ORDERED** that, within ten business days of this Order, Defendant Secretary

of State shall issue a Directive requiring that Ohio's county boards of elections may not reject

any provisional ballots cast by lawfully-registered voters in the November 2012 general election

for the following reasons:

1.  The voter cast his or her provisional ballot in the wrong precinct, *unless* the poll worker

who processed the voter's provisional ballot has:

a) determined the correct precinct for the voter;

b) directed the voter to the correct precinct;

---

[75] The Court's Order departs slightly from Plaintiffs' proposed preliminary injunction, to avoid imposing any presumption of poll-worker error.  *See Painter*, at 16 (holding, "election officials err in presuming poll-worker error").  The Court's Order leaves in place the existing measures employed by the Boards for counting and remaking wrong-precinct provisional ballots, as required under the Decree.

c) informed the voter that casting the wrong-precinct ballot would result in all votes on

the ballot being rejected under Ohio law; and

d) the voter refused to travel to the correct precinct and insisted on voting the invalid

ballot;

*and* the Board of Elections has verified that the precinct to which the poll worker directed the

voter was the correct precinct for that voter.  If the County Board of Elections cannot verify that

the poll worker directed the voter to the correct precinct, the votes cast on the provisional ballot

must be counted in all races and for all issues for which the voter would have been eligible to

vote if he/she had cast the ballot in the correct precinct.

2.    The provisional ballot envelope does not contain a voter signature and the County Board

of Elections has otherwise been able to determine that the voter is a registered voter; and/or the

provisional ballot envelope does not contain the voter's full printed name and the County Board

of Elections has otherwise been able to determine that the voter is a registered voter; and/or the

voter did not sign and/or print the voter's name in the correct place(s) on the ballot envelope and

the County Board of Elections has otherwise been able to determine that the voter is a

registered voter.

## V.    MOTION TO MODIFY THE CONSENT DECREE

On June 20, 2012, the Plaintiffs in *NEOCH* filed their Motion to Modify the Decree to

Prevent Constitutional Violations pursuant to Rule 60 and the Court's equitable authority to

modify the Decree's injunctive relief.  On July 9, 2012, the Court issued its Opinion and Order

Denying Defendants' Request to Vacate the Consent Decree.[76]  The Relators and the State

Defendants oppose modification of the decree on both procedural and substantive grounds.  As

---

[76] *See NEOCH*, 2012 U.S. Dist. LEXIS 94086.

57

of the Court's ruling in that Order upholding the validity of the Consent Decree, Plaintiffs'

Motion to Modify the Consent Decree is ripe for determination.

  The Motion to Modify requests this Court to make determinations on the merits of the

same constitutional violations in Ohio's provisional ballot laws alleged by Plaintiffs in the

Motion for Preliminary Injunction.  The Court's decision on the Motion for Preliminary

Injunction, by Plaintiffs' own representation to the Court,[77] grants the same equitable relief

requested by their Motion to Modify.  The Motion to Modify is therefore moot so long as the

injunction ordered in *SEIU v. Husted* remains in place.  The Court's decision on the Plaintiffs'

Motion to Modify is **STAYED**, indefinitely, subject to renewal if warranted upon a timely

request for good cause shown.


   **IT IS SO ORDERED.**


       **s/Algenon L. Marbley**

      **ALGENON L. MARBLEY**
      **UNITED STATES DISTRICT JUDGE**


**DATED:   August 27, 2012**

---

[77] Motion to Modify, at 5.

58