IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **SERVICE EMPLOYEES** | : | |
| **INTERNATIONAL** | : | |
| **UNION, LOCAL 1,** *et al.*, | : | **Case No. 2:12-CV-562** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **JON HUSTED,** *et al.*, | : | |
| | : | **Magistrate Terence P. Kemp** |
| | : | |
| **Defendants.** | : | |
| | : | |
| | | |
| **THE NORTHEAST OHIO COALITION** | : | |
| **FOR THE HOMELESS,** *et al.*, | : | **Case No. 2:06-CV-896** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **JON HUSTED, in his official capacity as** | : | |
| **Secretary of the State of Ohio,** | : | **Magistrate Judge Terence Kemp** |
| | : | |
| **Defendant.** | : | |
| | : | |
| **and** | : | |
| | : | |
| **STATE OF OHIO** | : | |
| | : | |
| **Intervenor-Defendant** | : | |

## OPINION AND ORDER

## I.  INTRODUCTION

These are two related actions in this Court: *Service Employees' International Union,*

*Local 1, et. al.  v. Husted, et. al.*, Case No. 2:12-cv-562 ("the *SEIU* case") and *The Northeast*

*Ohio Coalition for the Homeless, et. al. v. Husted & State of Ohio*, Case No. 2:06-cv-896 ("the

*NEOCH* case"). Before the Court are three distinct motions: (1) *SEIU* Plaintiffs' Renewed

Motion for Preliminary Injunction with Respect to Wrong-Location Provisional Ballots (*SEIU*

Dkt. 84); (2) *NEOCH* Plaintiffs' Motion to Modify April 19, 2010 Consent Decree (*NEOCH*

Dkt. 338) and; (3) *NEOCH* Defendants' Motion to Modify April 19, 2010 Consent Decree

(*NEOCH* Dkt. 342). *SEIU* Plaintiffs promptly renewed their Motion in light of the Sixth

Circuit's Decision of October 11, 2012, affirming in part and reversing in part this Court's

injunction on the issues of "right-location, wrong-precinct" provisional ballots and provisional

ballots with deficient affirmations. *NEOCH v. Husted*, ___ F.3d ___, 2012 WL 4829033 (6th

Cir. October 11, 2012) ("the *NEOCH* appeal"). Following that remand, Plaintiffs and

Defendants in the *NEOCH* case each moved to modify the April 19, 2010 Consent Decree. As

these cases were consolidated for the purpose of appeal, the Court continues to recognize that

consolidation on remand. Owing to the pendency of the November 6, 2012 election, at

Defendants' request, the Court ordered an expedited briefing schedule for these motions and

heard oral argument on October 24, 2012. These issues have been fully briefed and are now ripe

for decision.

## II. STATEMENT OF FACTS

### A. The *NEOCH* Case

The *SEIU* case and the *NEOCH* case, the subjects of a preliminary injunction and consent

decree respectively, are both actions originally brought in this Court. Plaintiffs in both cases are

groups of interested voters suing on behalf of their members to prevent the Secretary of the State

of Ohio from disqualifying provisional ballots in the November 6, 2012 election, an alleged

violation of Plaintiffs' members' constitutional rights.

The *NEOCH* case began in 2006, when Plaintiffs challenged Ohio's amended voter identification laws. The parties initially resolved the lawsuit, prior to a final adjudication on the merits, by entering a consent decree on April 19, 2010 ("the Consent Decree"). The Consent Decree, "among other provisions, mandated that the Board [of Elections] 'may not reject a provisional ballot cast by a voter, who uses only the last four digits of his or her social security number as identification' ["SSN-4 ballots"] if certain deficiencies in the ballot, including being cast 'in the wrong precinct, but in the correct polling place,' were the result of poll-worker error." *Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 233 (6th Cir. 2011) ("*Hunter I*") (quoting Consent Decree, at ¶5). This Court upheld the validity of Consent Decree earlier this year, a ruling affirmed in part and remanded in part by the Sixth Circuit in the *NEOCH* appeal, issued on October 11, 2012. *NEOCH*, ___ F.3d ___, 2012 WL 4829033. Following the remand, Plaintiffs and Defendants both moved to modify the Consent Decree, based on the Sixth Circuit's holding that treating SSN-4 ballots differently from provisional ballots obtained using other forms of identification likely violated equal protection under the Fourteenth Amendment. *Id*. at 14.

## B. The *SEIU* Case

During the ongoing *NEOCH* litigation, in early 2012, a group of organizations sued Ohio Secretary of State Husted to challenge Ohio's rules governing the counting of provisional ballots. This Court's previous decision, *SEIU Local 1 v. Husted*, ___ F.Supp.2d ___ 2012 WL 3643064 (S.D. Ohio Aug. 27, 2012) granted Plaintiffs' request to enjoin the Secretary from disqualifying "right location, wrong precinct" provisional ballots resulting from "poll-worker error," an injunction upheld in the *NEOCH* appeal. *NEOCH*, ___ F.3d ___, 2012 WL 4829033 at *13. The facts giving rise to the case are discussed in the prior decision. *SEIU Local 1*, ___

F.Supp.2d ___ 2012 WL 3643064 at *2-10. On appeal, however, the Sixth Circuit vacated a portion of the preliminary injunction which required the Secretary to count provisional ballots cast with deficient affirmations, deficiencies which this Court found to be due to poll-worker error. *NEOCH*, ___ F.3d ___ 2012 WL 4829033 at *15-6. To support the instant Motion, Plaintiffs have combed the State's "Incident Reports" from recent elections to identify numerous examples of poll-worker error causing provisional ballots cast in the *wrong location, wrong precinct*.[1] They rely on their voluminous evidentiary record discussed in this Court's previous *SEIU* decision. *SEIU Local 1*, ___ F.Supp.2d ___ 2012 WL 3643064 at *2-10. Plaintiffs' Renewed Motion for Preliminary Injunction seeks to expand the scope of this Court's prior "right location, wrong precinct" injunction to likewise enjoin the Secretary from disqualifying ballots cast in the wrong location and in the wrong precinct ("'wrong location, wrong precinct' ballots") due to poll-worker error.

### III. *SEIU* PLAINTIFFS' RENEWED MOTION FOR PRELIMINARY INJUNCTION

#### A. Standard for Granting Preliminary Injunction

Plaintiffs' Motion, to enjoin the Secretary from enforcing certain provisions of Ohio law in the upcoming November 6, 2012 election, invokes the four-factor balancing test for determining whether an injunction is appropriate under Fed. R. Civ. P. 65. The Court must weigh the following factors:

(1) whether the movant has a strong likelihood of success on the merits;

(2) whether the movant would suffer irreparable injury without the injunction;

(3) whether issuance of the injunction would cause substantial harm to others; and

(4) whether the public interest would be served by the issuance of the injunction.

---

[1] See *SEIU* Dkt. 12 with attached Exhibits A – ZZ.

*Hunter I*, 635 F.3d at 233.  These four factors "guide the discretion of the district court[;]" however, "they do not establish a rigid and comprehensive test."  *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 102 (6th Cir. 1982).  Whether the combination of the factors weighs in favor of issuing injunctive relief in a particular case is left to the discretion of the district court.  *See Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2007) (in reviewing an application to preliminarily enjoin operation of Arizona's voter identification procedures, the Supreme Court recognized courts' need to "weigh, in addition to the harms attendant upon issuance or nonissuance of an injunction, considerations specific to election cases' additional exigencies," and stated these complex determinations require "deference to the discretion of the District Court").

The Secretary has argued previously that, for Plaintiffs to meet their burden to obtain a preliminary injunction, they must "establish [their] case" by "clear and convincing evidence." (Secretary Opp., *SEIU* Dkt. 28 at 10) (citing *Damon's Rests., Inc. v. Eileen K Inc.*, 461 F. Supp. 2d 607, 621 (S.D. Ohio Aug. 30, 2006)).  While the Sixth Circuit has held that "the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion," *Leary*, 228 F.3d at 739, the Circuit further clarified that "a party is not required to prove his case in full at a preliminary injunction hearing and the findings of fact and conclusions of law made by a court granting the preliminary injunction are not binding at trial on the merits."  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (citations omitted).  For a plaintiff to receive the requested injunction, "it is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation."  *NEOCH*, ___ F.3d ___, 2012 WL

4829033 (quoting *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997)).

A plaintiff has "the burden of establishing a clear case of irreparable injury and of convincing the Court that the balance of injury favor[s] the granting of the injunction." *Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256, 257 (6th Cir. 1968). In the election law context, "[t]hese [four] factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together;" the factors do not each impose a distinct evidentiary burden on the Plaintiffs. *Northeast Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006) (stating, "[f]or example, the probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury the movants will suffer absent the stay").[2]

## B. Law and Analysis

### 1. Likelihood of Success on the Merits

Just as with the Plaintiffs' motion for an injunction on the "right location, wrong precinct" issue, Plaintiffs bring their constitutional claims under 42 U.S.C. § 1983. A claim under 42 U.S.C. § 1983 has two elements: (1) the defendant must be acting under the color of state law; and (2) the offending conduct must deprive the plaintiff of rights secured by federal law. *See League of Women Voters*, 548 F.3d at 475. There is no dispute that the Secretary acts under the color of state law when enforcing Ohio's election laws.

The parties do dispute whether the Secretary's actions and directives, specifically in directing county boards of election to reject provisional ballots cast at the "wrong location, wrong precinct," deprive Plaintiffs' members of their constitutional rights to equal protection and

---

[2] In any event, the Secretary does not dispute that the prospective injury to Plaintiffs in this case—the complete denial of an individual's right to vote—is irreparable. *See, e.g.*, *Miller v. Blackwell*, 348 F. Supp. 2d 916, 922 (S.D. Ohio 2004).

due process under the Fourteenth Amendment.  In light of the Sixth Circuit's October 11, 2012 Opinion, however, there is no longer any doubt that "the unreasonableness and fundamental unfairness of disqualifying wrong-precinct ballots caused by poll-worker error (equal protection and due process)" is a "likely constitutional violation[] . . . requiring injunctive relief."  *NEOCH*, ___ F.3d ___ 2012 WL 4829033 at *9.  While the Sixth Circuit affirmed this Court's previous finding that disqualification of "right location, wrong precinct ballots" likely violates the equal protection and due process guarantees under the Fourteenth Amendment, there is no logical or legal rationale to distinguish the disqualification of "wrong location, wrong precinct" ballots, provided they are also attributable to poll-worker error.

As the Sixth Circuit noted, when the state places a "substantial" burden on the right to vote – one that is greater than a "reasonable, nondiscriminatory restriction" but less than a "severe burden" – courts apply the *Anderson/Burdick* test.  That test compels this Court to:

> weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiffs' rights.'

*Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).  Since there is no specific test for the validity of voting regulations, this Court simply "must weigh the burden on voters against the state's asserted justifications and make the hard judgment that our adversary system demands."  *Obama for America v. Husted*, ___ F.3d ___ 2012 WL 4753397 (6th Cir. October 5, 2012).

The burden on voters imposed by Ohio's systemic disqualification of "wrong location, wrong precinct" ballots is substantial.  Disqualification of one's ballot is no victimless legal abstraction; it is disenfranchisement, the loss of the fundamental right to participate in the

democratic political process.  To disenfranchise a single voter is a matter for grave concern, but the Sixth Circuit affirmed this Court's finding that Ohio's disqualification of provisional ballots in recent elections has far exceeded that: more than 14,000 provisional ballots were disqualified in 2008 and more than 11,000 were disqualified in 2010.  *NEOCH*, 2012 WL 4829033 at *10. Unfortunately, the records kept by Ohio for those years do not allow us to distinguish between disqualifications for "right location, wrong precinct" and "wrong location, wrong precinct." Ohio does, however, have such data for the 2011 election.  In 2011, more than 1,800 disqualified provisional ballots were cast in the "right location, wrong precinct," while more than 2,400 disqualified ballots were cast in the "wrong location, wrong precinct."  (*NEOCH* Dkt. 9, Ex. B) The State of Ohio denied these citizens their right to vote by systemically disqualifying all ballots cast in the wrong location or wrong precinct, with no individual due process or inquiry into the cause of the ballot error.  Although these disqualifications affect only "provisional ballots," that fact "does not justify this additional burden; as . . . Ohio law now requires thirteen different categories of voters to cast provisional ballots, ranging from individuals who do not have an acceptable form of identification to those who requested an absentee ballot or whose signature was deemed by the precinct official not to match the name on the registration forms." *NEOCH*, 2012 WL 4829033 at *11.

Over the course of this litigation, Plaintiffs have presented "voluminous evidence" of disqualifications due to poll-worker errors.  *Id*. at *10.  Plaintiffs' Motion specifies four reasons for these errors with regard to "wrong location, wrong precinct" ballots, all of which have been documented to occur in recent elections:

> (1) Poll workers provide voters with the wrong-precinct ballots in the wrong location because poll workers incorrectly determine the voter's precinct by misunderstanding the precinct location guide.

8

(2) Poll workers provide voters with the wrong-precinct ballots in the wrong location even though they know voters are not assigned to that precinct or location because poll workers do not understand such ballots are rejected.

(3) Poll workers, under the misapprehension they are simply helping people to vote, distribute wrong-precinct ballots to all voters without attempting to locate their correct precinct because they do not understand such ballots are rejected.

(4) Poll workers misdirect voters to cast wrong-precinct ballots in the wrong location as a result of incorrect direction from county boards.

(*SEIU* Dkt. 84 at 14)  These poll-worker errors are the same as those that resulted in "right location, wrong precinct" ballots being cast and rejected; the errors occur regardless of whether a voter arrives at the correct or incorrect polling location.  Thus, the burden on voters imposed by Ohio's disqualification of "wrong location, wrong precinct" provisional ballots caused by poll-worker error is identical to the burden imposed by the disqualification of "right location, wrong precinct" provisional ballots caused by poll-worker error.  The Sixth Circuit affirmed that burden to be an unconstitutional burden on the right to vote properly remedied by an injunction directing the Secretary of State to count "right location, wrong precinct" ballots caused by poll-worker error.  *NEOCH*, 2012 WL 4829033 at *15.

Defendants contend that "the requirement to vote in the right location is not a severe burden."  This Court agrees.  If it were a severe burden, this Court would have to apply strict scrutiny to the challenged law.  That is of no import, however, as the Court finds Ohio's disqualification of "wrong location, wrong precinct" ballots is a substantial burden on the right to vote which is subject to the *Anderson/Burdick* test, as was the disqualification of "right location, wrong precinct" ballots.  "Wrong location, wrong precinct" ballot disqualifications are, in one sense, still more troubling as there have been numerous instances in which poll workers have directed voters to incorrect polling locations, even when voters originally arrived at the correct

location.[3]  Defendants' rebuttal that there are multiple methods for voters to determine their polling location and precinct is unpersuasive because, as the Sixth Circuit stated, the law "effectively requires voters to have greater knowledge of their precinct, precinct ballot, ***and polling place*** than poll workers."  *NEOCH*, WL 4829033 at *11 (emphasis added).  Furthermore, though Defendants' brief suggests voters bear the responsibility of finding the correct polling location, the Sixth Circuit held only last year that:

> Ohio has created a system in which ***state actors (poll workers) are given the ultimate responsibility of directing voters to the right location to vote.*** Yet, the state law penalizes the voter when a poll worker directs the voter to the wrong precinct, and the penalty, disenfranchisement, is a harsh one indeed. To disenfranchise citizens whose only error was relying on poll-worker instructions appears to us to be fundamentally unfair.

*Hunter I*, 635 F.3d at 243 (emphasis added).  The Sixth Circuit did not deem it reasonable that an individual voter should be better able to navigate Ohio's labyrinthine voting system than a trained poll worker, and neither does this Court.

This Court, therefore, finds substantial the burden imposed on a citizen's right to vote by automatically disqualifying a "wrong location, wrong precinct" provisional ballot where a poll worker caused the error.  The State attempts to overcome the weight of the burden on the right to vote by relying, as it did in its previous appeal, on its interest in "maintaining a precinct-based voting system."  (Dkt. 87 at 9)  The Sixth Circuit has recognized the State's legitimate interest in precinct-based voting.  *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 568-69

---

[3] *See, e.g.*, *SEIU* Dkt. 12 ¶54 & 12-43 at 2 (Cuyahoga 2011 Incident Reports) ("I must inform you of the many (at least 40 voters) who were misguided and directed to vote at our station.  Most of them informed me that they were sent by [a poll worker at another precinct] in error.  Some of the voters claimed they were sent to as many as (3) different locations – by mistake."); *SEIU* Dkt. 12 ¶54 & 12-45 at 10 (Franklin County 2011 Incident Reports) ("Polling Location sent them to another location 2 times."); *SEIU* Dkt. 12 ¶54 & 12-41 at 12 (Clermont 2010 Incident Reports) ("B of E employees sent a handicapped [provisional voter] to New Richmond when they belonged here . . . The difficulties of wandering around in the wrong place are amplified when in a wheelchair."); *SEIU* Dkt. 11 ¶5a &11-3 at 2 (Lucas County 2008 Incident Reports) (Voter "went to East Toledo Family Center where [she] voted in primary.  There I was told to come to East Side Central . . . they told her . . . to go back to East Toledo Family Center – that the people there were 'reading the book' wrong.").

(6th Cir. 2004). As this Court found previously, however, "[t]he relevance of *Sandusky* to the Plaintiffs' challenges to Ohio law . . . is limited. *Sandusky* was decided before Ohio instituted its amended Voter ID requirements in 2006 . . . that case did not address the *constitutionality* of the precinct eligibility requirement as applied to provisional ballots cast in the wrong precinct as a result of poll-worker error." *SEIU Local 1*, ___ F.Supp.2d ___ 2012 WL 3643064 at *19.

The State argues that its interest in precinct-based voting would be imperiled by Plaintiffs' proposed injunction because it is a "vote anywhere" remedy that would result in chaos. That argument mischaracterizes the requested relief and is incorrect. Plaintiffs' Motion in no way requests a "'vote anywhere' injunction in each Ohio county." A provisional ballot cast in the "wrong location, wrong precinct," as with a provisional ballot cast in the "right location, wrong precinct," will only be counted if caused by poll-worker error. If a voter attempts to cast her ballot at the wrong polling location, her ballot will not be counted unless the poll worker fails to perform her legal duty to inform the voter of: (1) her correct polling location and precinct; and (2) that her ballot will not be counted unless she casts it at her correct precinct. After receiving this information, if the voter insists on casting a ballot at the wrong location and in the wrong precinct, it will not be counted. Voters cannot vote anywhere. Voters can only vote in the correct precinct. Only if poll workers deny a voter her constitutional rights will her provisional ballot in the wrong precinct be counted. If poll workers obey the law, not a single vote cast in the wrong precinct will be counted in the November 6, 2012 election.

The State concedes that when a voter arrives in the wrong precinct, "[poll workers] must instruct the voter properly about travelling to the right place." (*SEIU* Dkt. 87 at 8) Therefore, the only substantive dispute the State has with Plaintiffs' proposed injunction is that it believes poll workers should not be required to "stop to record" their proper instructions to the wayward

voter. Regrettably, Plaintiffs' evidence shows that under the current system, poll workers simply are not giving voters the proper instructions. (Dkt. 84 at fn. 4) The many recorded incidents of poll workers giving voters incorrect instructions demonstrate that there is no way to determine whether poll-worker error caused a provisional ballot to be cast in the wrong location without a written affirmation that poll workers have directed voters to the correct polling location. The State need not allow voters to vote anywhere but their own precinct, but it is reasonable that the State informs voters of that fact, and where they can legally vote, before disenfranchising them.

Significantly, expanding the scope of the current injunction to also encompass "wrong location, wrong precinct ballots" imposes minimal additional burden on the State. In response to this Court's previous grant of a preliminary injunction regarding "right location, wrong precinct" ballots, the Secretary of State issued "Form No. 12-D" to the Boards of Election in September 2012. Form No. 12-D instructs poll workers to "[c]omplete this form whenever a voter's name does not appear in the signature poll book or poll list, the voter is in the wrong precinct of the correct multiple-precinct polling place and the voter insists on casting a provisional ballot in the wrong precinct." Oddly and, perhaps, confusingly, however, "Step 3" instructs the poll worker to "[w]rite the name and address of the voter's correct polling place below, if different from where you are now." If these forms are only to be used when the voter arrives at the correct multiple-precinct polling location, "Step 3" is superfluous. As such, the Secretary of State has already produced a form which poll workers can use to satisfy the conditions of the injunction Plaintiffs seek here. In fact, the same form can be used for "right location, wrong precinct" voters and "wrong location, wrong precinct" voters. The only change needed would be to replace the phrase "the voter is in the wrong precinct of the correct multiple-precinct polling place" with "the voter is in the wrong precinct or incorrect polling place," or words to that effect.

The State admitted at oral argument that the burden analysis of "wrong location, wrong precinct" disqualifications is essentially the same as that of "right location, wrong precinct" disqualifications, but contended the timing of this request for an injunction jeopardizes the public interest in orderly elections in a way the previous request did not.

Although the Court has considered and is empathetic to Defendants' concern that October is "too late to change election rules, as a matter of principle and practicality," that consideration does not outweigh the burden of denying the right to vote to thousands of Ohioans based on poll-worker error, which is state action. (Dkt. 87 at 6) In the digital age, the actual changes required of the State in expanding the existing preliminary injunction to include "wrong location, wrong precinct" provisional voters are minimal. It is also worth noting that this Court twice expedited the litigation on this Motion, once of its own accord and then again on Defendants' motion, in order to facilitate the State's implementation of the election laws. The burden of re-drafting election materials and re-training of poll workers, though not negligible, is minor and does not justify widespread voter disenfranchisement.

Since the proposed injunction would have practical effects on the conduct of the election in Ohio's precinct-based voting system, it is worth considering what those effects will be. In *Sandusky* the Sixth Circuit identified five advantages of Ohio's precinct system, known as "*Sandusky* factors:"

(1) it [the precinct system] caps the number of voters attempting to vote in the same place on election day;

(2) it allows each precinct ballot to list all of the votes a citizen may cast for all pertinent federal, state, and local elections, referenda, initiatives, and levies;

(3) it allows each precinct ballot to list only those votes a citizen may cast, making ballots less confusing;

13

(4) it makes it easier for election officials to monitor votes and prevent election fraud; and

(5) it generally puts polling places in closer proximity to voter residences.

*Sandusky*, 387 F.3d at 568-9. This Court explained, in granting Plaintiffs' previous motion for an injunction regarding "right location, wrong precinct" ballots, that the State's showing under these factors did not outweigh the substantial burden on the right to vote. The same analysis applies here with one difference; the injunction Plaintiffs seek here would apply to provisional voters at the wrong location as well as the wrong precinct.

Defendants note that "Ohio caps the number of voters attempting to vote in the same place on Election Day." (Dkt. 87 at 12) The Court recognizes there are many good reasons to do that, but, as explained above, the proposed injunction is not "a decision to allow voters to vote anywhere in the county," which "would be unmanageable due to lines, staffing, and other resource issues." (Dkt. 87 at 13) The State's assertion to the contrary is specious. Voters can only vote at their correct locations and in their correct precincts.[4] A ballot in the wrong location would only be counted if the poll worker failed to: (1) inform the voter that a vote cast there would not be counted; and (2) direct the voter to her correct polling place. Furthermore, there is no evidence in the record of any voter knowingly attempting to vote at a more conveniently located polling place, rather than her assigned location, whereas there is a great deal of evidence that poll workers have directed voters to the wrong polling place.

This leads to the State's second misdirected argument: that "[w]ith a busy Election Day [it] would be nearly impossible for pollworkers to document every conversation with a voter about that voter's proper location." (Dkt. 87 at 13) The injunction would only require a poll-

---

[4] At oral argument Defendants raised the prospect of interested parties "gaming the system" by gathering van-loads of voters and taking them to the wrong location in order to overwhelm poll workers required to redirect them. This unlikely hypothetical pales in comparison to the documented incidents of poll workers actively directing or passively allowing voters to cast ballots in the wrong location.

worker to document a conversation with a voter who arrived at the wrong location if, in the words of Form No. 12-D, "the voter refused to travel to the correct precinct and insists on voting a wrong-precinct provisional ballot in this precinct." For this to occur, a poll worker would have first directed the voter to the correct polling location and informed the voter that a ballot cast in that location and precinct would not be counted. This scenario is unlikely to occur. Logic dictates that the vast majority of voters, upon being told they are in the wrong location and their vote will not be counted, will either go to the correct polling place or choose not to vote. In either scenario, a poll worker need not fill-out the 12-D Form, or take any action to record the conversation.

The Court has now, as it must, "weigh[ed] the burden on voters against the state's asserted justifications and make the hard judgment that our adversary system demands." *Obama for America v. Husted*, ___ F.3d ___ 2012 WL 4753397 (6th Cir. October 5, 2012). It is clear that, under the law of the Sixth Circuit, the State of Ohio's systemic disqualification of "wrong location, wrong precinct ballots" cast owing to poll-worker error is a substantial burden on the right to vote. Although the State has legitimate interests in maintaining a precinct-based voting system, these interests do not actually conflict with the injunction Plaintiffs' seek. Nor do these interests outweigh, under the *Burdick/Anderson* test, the harm caused by disenfranchising thousands of voters whose "only error was relying on poll-worker instructions." *Hunter I*, 635 F.3d at 243. The Plaintiffs have satisfied their burden to show a likelihood of success on the merits.

### 2. Remaining Preliminary Injunction Factors

Given that in an election case the four preliminary injunction factors are "interrelated concerns" to "be balanced together," neither party argued the three remaining factors at this stage

of the proceedings. Nevertheless, the Court considers all four factors and finds that when balancing all four, Plaintiffs have still satisfied their burden for the grant of an injunction. Defendants do not contest that denial of the right to vote constitutes irreparable harm. At the same time, for the same reasons stated by the Sixth Circuit in the *NEOCH* appeal granting this injunction harms neither the State, nor the public interest. It merely extends the injunction regarding "right location, wrong precinct" provisional ballots to "wrong location, wrong precinct" provisional ballots. Furthermore, as affirmed by the Sixth Circuit, the injunction which already issued from this Court is narrowly tailored to address the harm to Plaintiffs.

### 3. Conclusion and Appropriate Injunctive Relief

Plaintiffs have demonstrated they are likely to prevail on the argument that the disqualification of "wrong location, wrong precinct ballots" caused by poll-worker error is both a violation of equal protection and a denial of due process. Consideration of all four factors necessary to grant a preliminary injunction, including the public interest in orderly elections and the irreparability of the State's denial of the right to vote, demonstrates the balance weighs definitively in favor of granting the injunction Plaintiffs seek. Therefore, Plaintiffs' Motion for an Injunction with Respect to Wrong-Location Provisional Ballots is **GRANTED**.

The Court determines the following preliminary injunction on the Board's enforcement of Ohio law to be the appropriate relief, least restrictive upon the State, adequate to ensure the protection of Plaintiffs' constitutional rights in the November 6, 2012 election.

It is hereby **ORDERED** that, within five business days of this Order, Defendant Secretary of State shall issue a Directive requiring that Ohio's county boards of election shall not reject any provisional ballot cast by a lawfully-registered voter in the November 6, 2012 election for the following reason:

1. The voter cast his or her provisional ballot in the wrong polling place, *unless* the poll worker who processed the voter's provisional ballot has:

a) determined the voter's correct polling place and precinct and;

b) directed the voter to the correct polling place and precinct;

c) informed the voter that casting a provisional ballot in the wrong polling place would result in all votes on the ballot being rejected under Ohio law; and

d) the voter refused to travel to the correct polling place and insisted on voting the invalid ballot;

*and* the Board of Elections has verified that the polling place and precinct to which the poll worker directed the voter was the correct polling place and precinct. If the County Board cannot verify the poll worker directed the voter to the correct polling place and precinct, the votes cast on the provisional ballot must be counted in all races and for all issues for which the voter would have been eligible to vote if he or she had cast the ballot in the correct precinct.

**IT IS SO ORDERED.**

## IV. CROSS MOTIONS TO MODIFY CONSENT DECREE

### A. Law and Analysis

Following the Sixth Circuit's remand of this Court's grant of the injunction sought by Plaintiffs with regard to the "deficient affirmation" ballots, Plaintiffs and Defendants each moved to modify the Consent Decree and opposed the motions of their counterparts. Since both motions seek to modify the Consent Decree to which each party voluntarily agreed, the same statement of law applies to both motions.

The Consent Decree applies only to the counting of provisional ballots cast by voters who identify themselves with the final four digits of their social security numbers ("SSN-4 voters").

The Sixth Circuit has now held that the section III(5)(b)(vi) of the Consent Decree, which orders that deficient affirmation ballots which are the result of poll-worker error be counted, constitutes "preferential treatment of SSN-4 provisional ballots." Thus, the Sixth Circuit "join[ed] the parties and the district court in finding that the consent decree's different treatment of similarly situated provisional ballots likely violates equal protection." *NEOCH v. Husted*, ___ F.3d ___, 2012 WL 4829033 at *14 (6th Cir. October 11, 2012). Given that holding, the issue before this Court is not whether the differential treatment of "deficient affirmation" ballots under the Consent Decree is an equal protection violation, but rather the proper remedy for that violation. The Plaintiffs contend that this Court should expand the protection given to SSN-4 voters by Section III(5)(b)(vi) and issue a statewide injunction directing the State to count all provisional ballots with deficient affirmations "caused by poll worker error," regardless of the form of identification provided. Defendants, in contrast, request the Court excise that section of the Consent Decree such that the State is not required to count provisional ballots with deficient affirmations.

Federal Rule of Civil Procedure 60(b)(5) allows the Court to "relieve a party . . . from a final judgment" if "applying it prospectively is no longer equitable" or for "any other reason that justifies relief." Usually, a movant seeking to modify a consent decree bears the burden to show the proposed modification is justified. *NEOCH*, 2012 WL 4829033 at *18-9 (citing Fed. R. Civ. P. Rule 60(b)(5)); *Northridge Church* 647 F.3d at 613-14. In the instant case, the Sixth Circuit has relieved both parties of their burdens in holding that the Consent Decree as currently drafted violates equal protection. On remand, the Sixth Circuit left no doubt that this Court must modify the Consent Decree. The Court now decides whether to grant Plaintiffs' or Defendants' proposed modification.

The relief Plaintiffs' seek by moving to modify the Consent Decree, however, is precisely that which the Sixth Circuit explicitly denied them in the *NEOCH* decision. Based on the same arguments Plaintiffs make here, this Court previously granted the *SEIU* Plaintiffs an injunction which, in relevant part, stated:

> Ohio's county boards of elections may not reject any provisional ballots cast by lawfully-registered voters in the November 2012 general election for the [] reason[] [that] [t]he provisional ballot envelope does not contain a voter signature . . . and/or the provisional ballot envelope does not contain the voter's full printed name . . . and/or the voter did not sign and/or print the voter's name in the correct place(s) on the ballot envelope . . .

*SEIU Local 1*, 2012 WL 3643064 at *30. The Sixth Circuit vacated that portion of the injunction, simultaneously holding that in the evidentiary record to date, "all of the identified deficiencies arise from ***voters' failure*** to follow the form's rather simple instructions," and not poll-worker error. *NEOCH*, 2012 WL 4829033 at *15 (emphasis added). Plaintiffs are correct that the Sixth Circuit did not hold that deficient affirmations could never be the result of poll-worker error. The Sixth Circuit did hold, however, that "the spotty record and Ohio law do not support the district court's presumption of poll-worker error, we find no likely constitutional violation." *Id.* Since the Sixth Circuit has now held the instances of deficient affirmations supported by evidence are actually the result of voter error, not poll-worker error, it is not unconstitutional for the State to disqualify those ballots. This Court's power to issue an injunction against the State is predicated on the State denying constitutional rights to citizens. Here, the Sixth Circuit held that, on the record as it stands, there is no denial of constitutional rights when the State disqualifies a provisional ballot because the voter's affirmation is deficient. Thus, this Court has no power to enjoin the State with regard to the deficient affirmation ballots.

Plaintiffs argued at the October 24, 2012 hearing that they only seek an injunction to order the counting of ballots with deficient affirmation due to "poll-worker error." The problem

for Plaintiffs is that they have adduced no evidence that deficient affirmations are ever the result of poll-worker error. The only proposed examples of poll-worker error resulting in a deficient affirmation in either the *NEOCH* or *SEIU* case the Sixth Circuit explicitly held to be unsupported by evidence. Put another way, without something more in the way of evidence of poll-worker error, there is no ipso facto violation of equal protection or due process when the State disqualifies provisional ballots suffering from those defects.[5]

Furthermore, the prospective relief Plaintiffs seek here is an extraordinary remedy, and even if the request is couched as a modification of the Consent Decree, this Court cannot grant such broad relief without any evidence to support it. The Consent Decree ordered the State, in Section III(5)(b), to count provisional ballots if:

> vi. The voter did not complete or properly complete and/or sign the provisional ballot application for reasons attributable to poll worker error; or
>
> vii. The poll worker did not complete or properly complete and/or sign the provisional ballot application witness line and/or the provisional ballot affirmation form, except for reasons permitted by the governing statues.

Critically, Section III(5)(b)(vii) remains in the Consent Decree to ensure no provisional ballot is disqualified when a poll worker fails to complete her designated portion of the envelope and the State does not dispute that. *SEIU* Dkt. 28 at 17. Directive 2012-01, which Secretary Husted

---

[5] The Court observes that the Sixth Circuit's holding in the *NEOCH* appeal appears to conflict with its statement in *Hunter*, approvingly quoted in another part of the *NEOCH* appeal, that "[t]o disenfranchise citizens whose only error was relying on poll-worker instructions appears to us to be fundamentally unfair." While this Court recognizes the Sixth Circuit made that statement in the context of poll workers directing, or failing to direct, voters to the proper location and precinct, it is equally applicable to the issue of deficient affirmations. The State has created the instrumentalities of voting, such as the provisional ballot. These forms have, at times, even confused these litigants and this Court, so they are certain to confuse some voters. It is unreasonable to believe most voters who produce ballots with deficient affirmations purposefully affirm their provisional ballots in a deficient manner. Citizens who take the time to vote are unlikely to act affirmatively in order to disqualify their vote. By analogy to the rule of drafting in contract law, the Court suggests ambiguities in the form should be construed against the drafter, here, the State, not the well-intentioned voter. When the State disqualifies a deficient affirmation ballot, it shifts the rule of drafting to burden the non-drafting party, the voter. That state action to deprive the franchise of a citizen attempting to cast a ballot in good faith also raises serious substantive due process concerns. It would seem a simple matter for a poll worker to glance over the provisional ballot to ensure the voter has signed and written in the correct places; that is what the *Hunter* logic suggests to this Court. That was not the logic adopted by the *NEOCH* panel, and thus, this Court follows the *NEOCH* panel in its departure from *Hunter I* in this case.

issued on January 4, 2012, expressly instructed county boards of election that provisional ballots are not to be rejected if the poll worker fails to fill out his or her portion of the provisional ballot envelope. As to Section III(5)(b)(vi), the Sixth Circuit's *NEOCH* decision renders it irrelevant.

## B. Conclusion

Both parties concur that the Consent Decree as it currently reads cannot stand in light of the Sixth Circuit's October 11, 2012 Decision. To treat deficient affirmation ballots differently for SSN-4 voters would deny equal protection to those provisional voters using alternative forms of identification. The sole issue is whether to excise the deficient affirmation clause from the Consent Decree or, in the alternative, to require the State to count all provisional ballots with deficient affirmations. This Court's power to issue an injunction against the State is predicated on the State denying constitutional rights to citizens. The Sixth Circuit held that on the record as it stands there is no denial of constitutional rights when the State disqualifies a provisional ballot because the voter's affirmation is deficient. In the proceedings in this Court, Plaintiffs have adduced no further evidence to the contrary. Thus, this Court has no power to enjoin the State with regard to the deficient affirmation ballots and the appropriate remedy is to excise Section III(5)(b)(vi) of the Consent Decree.[6]

The Court hereby **GRANTS** Defendants' Motion to Modify the April 19, 2010 Consent Decree and **DENIES** Plaintiffs' Motion to Modify the April 19, 2010 Consent Decree. As a

---

[6] It is worth reiterating that the Sixth Circuit did not hold a deficient affirmation could never be the result of poll-worker error, nor does the Court find that here. Indeed, there are numerous scenarios the Court can imagine in which poll-worker error might result in a deficient affirmation. For instance, a poll-worker might mistakenly instruct a voter to sign in the wrong place, or tell her it is not necessary to both sign and print her name. At this stage of the litigation, however, there is no evidence of such events ever having occurred. In the absence of evidence, it is not appropriate to grant prospective relief. If evidence comes to light in the future, however, that poll-workers have caused deficient affirmations, it would be appropriate for this Court to revisit the issue.

result, Section III(5)(b)(vi) of the Consent Decree relating to "deficient affirmation" provisional ballots is, hereby, **VACATED**.

      **IT IS SO ORDERED.**

                                                    **s/Algenon L. Marbley**
                                                  Algenon L. Marbley
                                                  United States District Judge

**Dated: October 26, 2012**